2011 UT 50

**MARION ENERGY, INC.; State of Utah, School and Institutional Trust Lands Administration, Plaintiffs and Appellants,**

v.

**KFJ RANCH PARTNERSHIP, Defendant and Appellee.**

No. 20090796.

Supreme Court of Utah.

Aug. 19, 2011.

Jack R. Luellen, Relma M. Miller, Denver, CO, for plaintiff Marion Energy, Inc.

Thomas A. Mitchell, Salt Lake City, for plaintiff School and Institutional Trust Lands Administration.

Joane P. White, Price, Thomas R. Karrenberg, Jon V. Harper, Samantha J. Slark, Salt Lake City, for defendant.

Phillip Wm. Lear, Jeffrey R. Taylor, Salt Lake City, for amicus Utah Petroleum Association.

## AMENDED OPINION*

Associate Chief Justice DURRANT, opinion of the Court:

### INTRODUCTION

¶ 1 Appellants, Marion Energy, Inc. (Marion) and the State of Utah School and Institutional Trust Lands Administration (the Trust), lease and own oil and gas deposits that lie underneath property owned by the KFJ Ranch Partnership (KFJ). In order to build a road to access these deposits, Marion and the Trust seek to condemn a portion of KFJ's land. To do so, they rely upon a statute that permits the exercise of eminent domain for the construction of "roads ... to facilitate ... the working of ... mineral deposits." [1] The question for our resolution is whether the phrase "mineral deposits," as used in this statute, was intended by the Legislature to encompass oil and gas deposits.

¶ 2 We conclude that the answer to this question is not apparent from the statute's plain language, as is evident from the fact that the phrase "mineral deposits" is defined in some sections of the Utah Code to include oil and gas, but defined in other sections to exclude oil and gas. Because we find that this phrase is susceptible to either of these reasonable interpretations, we conclude that the statute upon which Marion and the Trust rely is ambiguous. When faced with such an ambiguity in a statute purporting to grant the power of eminent domain, we strictly

---

* The court has rewritten paragraphs 28–30.

1. Utah Code Ann. § 78B–6–501(6)(a) (2008). Since this appeal was filed the language of section 501(6)(a) has been amended. Except where otherwise indicated, we refer to the 2008 version of the statute throughout this opinion.

construe the ambiguity against the condemning party.[2] Accordingly, we hold that Marion and the Trust are not authorized by this statute to condemn KFJ's land. We therefore affirm the district court's dismissal of Marion and the Trust's condemnation action.

## BACKGROUND

¶ 3 KFJ is the owner of the KFJ Ranch, which consists of approximately 9,400 acres of land located near Price, Utah. Approximately 6,600 acres of this land are owned by KFJ in fee simple. The remaining 2,800 acres are leased from the state and federal governments.

¶ 4 Marion is the lessee of two oil and gas deposits located in Price, Utah. Marion leased these deposits from the Trust. Both of the leases lie beneath surface land owned or leased by KFJ.

¶ 5 In an effort to exploit its leased oil and gas deposits, Marion wishes to construct two wells on surface lands owned by KFJ. Due to the topography of the land and the proposed well locations, Marion contends that it is "impossible ... to access [its] leases without crossing surface lands owned and/or controlled by" KFJ. To resolve this dilemma, Marion attempted to negotiate an easement with KFJ that would allow Marion to cross KFJ's land to access its oil and gas deposits. KFJ refused these requests.

¶ 6 Following KFJ's refusal, Marion and the Trust brought a condemnation action in the district court seeking to condemn nearly fifteen acres of KFJ's property to construct a four-mile-long road giving Marion access to the proposed well locations. An appraiser hired by Marion estimated that the total value of the land sought to be condemned was $28,000.

¶ 7 In their condemnation action before the district court, Marion and the Trust attempted to invoke what they refer to as the "ex-press rights of eminent domain granted by the legislature and codified as Utah Code [section] 78B–6–501(6)(a)." Section 501(6)(a) permits the exercise of eminent domain for the construction of "roads, railroads, tramways, tunnels, ditches, flumes, pipes, and dumping places to facilitate the milling, smelting, or other reduction of ores, or the working of mines, quarries, coal mines, or mineral deposits including minerals in solution."[3]

¶ 8 After initiation of the condemnation action, KFJ moved to dismiss based on its contention that section 501(6)(a) does not grant Marion and the Trust the power of eminent domain to condemn land to build a road to access leased oil and gas deposits. In response to KFJ's motion, the district court conducted a hearing to determine whether section 501(6)(a) "provide[s] authority to take lands for roads to access oil and gas deposits."

¶ 9 To resolve this question, the district court began by noting that it was "required to consider the plain language of the statute, to consider that each word has been used advisedly, and to presume any omissions are purposeful." Looking to the statute's text, the court then observed that section 501(6)(a) "lists the substances for which land can be condemned for roads, and [that] oil and gas are not included." Additionally, the court determined that the fact that "oil and gas are specifically mentioned in Utah Code [section] 78B–6–501(6)(d) ... shows [that] the legislature purposefully intended to exclude oil and gas from ... [section] 78B–6–501(6)(a)." Based on this analysis, the district court granted KFJ's motion to dismiss, concluding that section 501(6)(a) "does not provide authority to take land for roads to access oil and gas deposits."

¶ 10 On appeal, Marion and the Trust contend that the district court erred in concluding that section 501(6)(a) does not provide

---

**2.** *See Bertagnoli v. Baker,* 117 Utah 348, 215 P.2d 626, 627–28 (1950) ("The right of eminent domain, being in derogation of the rights of individual ownership in property, has been strictly construed by the courts so that no person will be wrongfully deprived of the use and enjoyment of his property."); *Great Salt Lake Auth. v. Island Ranching Co.,* 18 Utah 2d 45, 414 P.2d 963, 969

(1966) (Callister, J., dissenting) ("When the right to exercise the power [of eminent domain] can only be made out of argument and inference, it does not exist.").

**3.** Utah Code Ann. § 78B–6–501(6)(a) (2008).

authority to condemn land to build a road to access the leased oil and gas deposits. In support of this position, Marion and the Trust argue that the plain language of section 501(6)(a) and over one hundred years of precedent demonstrate that the phrase "mineral deposits" includes oil and gas. Additionally, Marion and the Trust argue that any interpretation of the phrase "mineral deposits" that excludes oil and gas would create an absurd result.

¶ 11 In contrast, KFJ argues that the plain language of section 501(6)(a) does not authorize Marion to condemn land to build a road to access its leased oil and gas deposits. Alternatively, KFJ contends that section 501(6)(a) is ambiguous and that we must strictly construe this ambiguity against Marion—the party seeking to exercise the power of eminent domain. We have jurisdiction to hear this appeal pursuant to section 78A–3–102(3)(j) of the Utah Code.

### STANDARD OF REVIEW

¶ 12 "We review questions of statutory interpretation for correctness, affording no deference to the district court's legal conclusions." [4]

### ANALYSIS

I.  SECTION 501(6)(a) DOES NOT AUTHORIZE MARION TO CONDEMN LAND TO BUILD A ROAD TO ACCESS ITS OIL AND GAS DEPOSITS

¶ 13 In relevant part, section 501(6)(a) of the Utah Code provides that the right of eminent domain may be exercised for the building of "roads . . . to . . . facilitate the . . . working of . . . mineral deposits." [5] The central question presented for our review is whether subsection (6)(a)'s use of the phrase "mineral deposits" encompasses the terms "oil" and "gas" and thereby provides Marion with authority to condemn KFJ's property to build a road to access its leased oil and gas deposits. Because we conclude that section 501(6)(a) is ambiguous, and because we strictly construe this ambiguity against the condemning party, we hold that section 501(6)(a) does not provide Marion with authority to condemn KFJ's land.

¶ 14 It is well settled that when faced with a question of statutory interpretation, "our primary goal is to evince the true intent and purpose of the Legislature." [6] "The best evidence of the legislature's intent is 'the plain language of the statute itself.' " [7] Thus, "[w]hen interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." [8] Additionally, we "presume[ ] that the expression of one [term] should be interpreted as the exclusion of another." [9] We therefore seek to give effect to omissions in statutory language by presuming all omissions to be purposeful.

¶ 15 When the " 'meaning of [a] statute can be discerned from its language, no other interpretive tools are needed.' " [10] But when statutory language is ambiguous—in that its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis—we generally resort to other modes of statutory construction and "seek guidance from legislative history" and other accepted

---

4. *State v. Gallegos*, 2007 UT 81, ¶ 8, 171 P.3d 426.

5. *See* UTAH CODE ANN. § 78B–6–501(6)(a) (2008).

6. *Salt Lake Cnty. v. Holliday Water Co.*, 2010 UT 45, ¶ 27, 234 P.3d 1105 (internal quotation marks omitted).

7. *State v. Miller*, 2008 UT 61, ¶ 18, 193 P.3d 92 (quoting *State ex rel. Z.C.*, 2007 UT 54, ¶ 6, 165 P.3d 1206).

8. *Hutter v. Dig–It, Inc.*, 2009 UT 69, ¶ 32, 219 P.3d 918.

9. *Carrier v. Salt Lake Cnty.*, 2004 UT 98, ¶ 30, 104 P.3d 1208 (internal quotation marks omitted).

10. *State v. Harker*, 2010 UT 56, ¶ 12, 240 P.3d 780 (quoting *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135); *see also Nelson v. Salt Lake Cnty.*, 905 P.2d 872, 875 (Utah 1995) ("When language is clear and unambiguous, it must be held to mean what it expresses, and no room is left for construction." (internal quotation marks omitted)).

sources.[11]  In some specific contexts, however, we have adopted unique rules that guide our construction of ambiguous terms.[12]

¶ 16 For instance, because the exercise of eminent domain results in the derogation of a property owner's right to use and enjoy his land, we have stated that any ambiguity in statutory language purporting to grant the power of eminent domain must be strictly construed in favor of the property owner and against the condemning party.[13]  In that context, we stated in *Bertagnoli* that "the extent to which the power [of eminent domain] may be exercised is limited to the *express terms and clear implication of the statute.*"[14]  Not only is this rule of strict construction supported by our precedent, it is also consistent with the "majority rule" for interpreting eminent domain statutes expressed in numerous authorities on this topic.[15]

¶ 17 Given this rule of strict construction, Marion is authorized to condemn KFJ's land to build a road to access its leased oil and gas deposits *only* if such authority is expressly granted or clearly implied by the plain language of section 501(6)(a).[16]  In support of

11.  *Taylor ex rel. Taylor v. Ogden City Sch. Dist.,* 927 P.2d 159, 167 (Utah 1996) (Durham, J., dissenting).

12.  *See, e.g., Cnty. Bd. of Equalization v. Utah State Tax Comm'n,* 944 P.2d 370, 373–74 (Utah 1997) (noting that we construe ambiguities in tax imposition statutes "liberally in favor of the taxpayer" (internal quotation marks omitted)); *Bertagnoli v. Baker,* 117 Utah 348, 215 P.2d 626, 627–28 (1950) (holding that all ambiguities in statutes granting the power of eminent domain must be construed strictly against the condemning party).

13.  *See, e.g., Bertagnoli,* 215 P.2d at 628 ("The right of eminent domain, being in derogation of the rights of individual ownership in property, has been strictly construed by the courts so that no person will be wrongfully deprived of the use and enjoyment of his property."); *see also Salt Lake Cnty. v. Murray City Redevelopment,* 598 P.2d 1339, 1345 (Utah 1979) (" 'Statutes conferring the power of condemnation under the right of eminent domain are strictly construed.' " (quoting *Tremonton v. Johnston,* 49 Utah 307, 164 P. 190, 191 (1917))); *Great Salt Lake Auth. v. Island Ranching Co.,* 18 Utah 2d 276, 421 P.2d 504, 505–06 (1966) (applying the rule of strict construction articulated in *Bertagnoli* ).

14.  215 P.2d at 627 (emphasis added).  The dissenting opinion contends that the rule articulated in *Bertagnoli* is not "well-settled" because it conflicts with our statement in *Monetaire Mining Co. v. Columbus Rexall Consolidated Mines Co.* that "it is generally agreed that where the right of eminent domain is granted for a particular purpose, then the statute must be given a liberal construction in furtherance of such purpose." 53 Utah 413, 174 P. 172, 175 (1918).  But unlike the rule of strict construction articulated in *Bertagnoli,* the rule announced in *Monetaire Mining Co.* does *not* apply to ambiguous eminent domain statutes. *See id.*  Instead, the rule announced in *Monetaire Mining Co.*—under which we are to liberally construe eminent domain statutes—applies *only* when a statute *"clear[ly]* and *explicit[ly]* ... grants the right of eminent domain for [a particular] purpose." *Id.* (emphases added).

Accordingly, because these rules are designed to resolve entirely distinct issues, we disagree that they conflict with one another.

15.  *See, e.g.,* Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 64:6 (7th ed. 2010) ("Grants of the power of eminent domain must be found expressly or by necessary implication in legislation, and the policy has become well established that such grants are strictly interpreted against the condemning party and in favor of the owners of property sought to be condemned."); 26 Am. Jur.2d *Eminent Domain* § 24 (2010) ("A grant of the power of eminent domain is to be strictly construed against the condemning party and in favor of the property owner, and the prescribed method of taking must be strictly pursued."); 29A C.J.S. *Eminent Domain: Who May Exercise Power* § 24 (2010) ("The right to exercise the power of eminent domain must be conferred by statute, either in express words or by necessary implication.  Because such power is in derogation of common right, the acts conferring it generally should not be enlarged or extended by inference or implication.  Instead, they are to be strictly construed in favor of the landowner so that no person will be deprived of the use and enjoyment of his or her property except by a valid exercise of the power.").

16.  *See Bertagnoli,* 215 P.2d at 627–28; *see also Island Ranching Co.,* 414 P.2d at 969 (Callister, J., dissenting) ("When the right to exercise the power [of eminent domain] can only be made out of argument and inference, it does not exist.").  The dissenting opinion contends that the canon articulated in *Bertagnoli* should not be applied in cases "where the interests of two private property holders are at issue." *Infra* ¶ 51.  We disagree.  Although Marion and the Trust have property interests at issue in this case, only KFJ faces the possibility of being permanently deprived of its property through the unauthorized use of the power of eminent domain.  The protection of private property owners against such unauthorized condemnations is the very purpose for which the rule of strict construction an-

their position that section 501(6)(a) provides this authority, Marion and the Trust contend that "as a matter of law" the phrase "mineral deposits" encompasses oil and gas. They also argue that any interpretation of the phrase "mineral deposits" that does not include oil and gas would create an absurd result. As explained below, we disagree with these arguments and conclude that section 501(6)(a) does not provide Marion with the authority it seeks to exercise.

### A. The Language of Section 501(6)(a) Is Ambiguous and Does Not Clearly or Implicitly Provide Authority to Take Land to Build a Road to Reach Oil and Gas Deposits

¶ 18 When interpreting statutory language, we generally seek to "read each term according to its ordinary and accepted meaning." [17] But the phrase "mineral deposits" does not have a single "ordinary and accepted meaning." Instead, the phrase's meaning may vary and must be interpreted based upon the context in which it is used.

¶ 19 In *Carrier*, this court was asked to determine whether a zoning ordinance's use of the phrase "mineral extraction" encompassed gravel pit operations.[18] To resolve this issue, we began by noting that "[i]n its broadest sense, the term 'mineral' necessarily encompasses the term 'gravel.'" [19] But rather than adopting this broad definition, we determined that what "the term 'mineral' actually incorporates . . . in any given situation . . . is largely contextual." [20] This is because the term "'mineral' is a word of general language, and [is] not per se a term of art.'" [21] Instead, the term "'is used in many senses'" and is "'susceptible to limitation or expansion according to the intention with which it is used in the particular instru-

ment or statute.'" [22] Recognizing that the term "mineral" is ambiguous when read in isolation, we looked to its context in the statute and in other related statutes. After doing so, we held that the term "mineral extraction" did not encompass gravel pit operations.[23]

¶ 20 Like the term "mineral," the phrase "mineral deposit" may be "used in many senses" and is "susceptible to limitation or expansion according to the intention with which it is used." Thus, to determine what the phrase "mineral deposits" actually incorporates in any given situation, we must look to the context in which the phrase is used. Unfortunately, the context in which the phrase "mineral deposits" is used in section 501 does not indicate whether the Legislature intended the phrase to encompass oil and gas deposits. Indeed, looking at the text of section 501(6)(a) and its accompanying subsections, we are persuaded that reasonable arguments can be made in favor of defining "mineral deposits" so broadly as to include oil and gas, or so narrowly as to exclude oil and gas.

¶ 21 In examining the text of section 501 as "a whole," [24] we find it highly relevant that subsection (6)(d) provides that the right of eminent domain may be exercised to condemn property to build "gas, oil, or coal pipelines." [25] On one hand, this language may be read as suggesting that the Legislature did *not* intend for oil and gas to be provided for in subsection (6)(a). Indeed, KFJ has argued that because the terms "oil" and "gas" are expressly included in subsection (6)(d) and omitted from subsection (6)(a) we must presume that this omission was purposeful and must interpret subsection (6)(a) as *not* reaching oil and gas deposits.

nounced in *Bertagnoli* was created; we therefore feel it is applicable to the instant case.

17. *Harker*, 2010 UT 56, ¶ 12, 240 P.3d 780 (internal quotation marks omitted).

18. 2004 UT 98, ¶ 1, 104 P.3d 1208.

19. *Id.* ¶ 32.

20. *Id.*

21. *Id.* (quoting *Bumpus v. United States*, 325 F.2d 264, 266 (10th Cir.1963)).

22. *Id.* (quoting *Bumpus*, 325 F.2d at 266).

23. *Id.* ¶ 41.

24. *Harker*, 2010 UT 56, ¶ 12, 240 P.3d 780 (internal quotation marks omitted).

25. Utah Code Ann. § 78B–6–501(6)(d) (2008).

¶ 22 On the other hand, one could reasonably read subsection (6)(d)'s inclusion of the terms "oil" and "gas" as an indication that the Legislature intended for these substances to be encompassed in subsection (6)(a)'s use of the phrase "mineral deposits." For instance, Marion has argued that the Legislature intended subsection (6)(a) to relate to the working and exploitation of mineral products, and that subsections (6)(b) through (6)(f) were intended to provide for the storage and transportation of such mineral products. Accordingly, Marion contends that because the Legislature included the terms "oil" and "gas" in subsection (6)(d), it must have intended subsection (6)(a)'s use of the phrase "mineral deposits" to encompass oil and gas. After considering the text of section 501 as a whole, we conclude that both of these arguments provide reasonable interpretations of subsection (6)(a)'s use of the phrase "mineral deposits."

¶ 23 In reaching this conclusion, we also find relevant that other sections of the Utah Code specifically define the phrase "mineral deposits" as both including or excluding oil and gas. For instance, section 53C–1–103(4) of the Utah Code—the School and Institutional Trust Lands Management Act (SITLA)—defines the term "mineral" as including "oil, gas, and hydrocarbons."[26] Alternatively, the Utah Mined Land Reclamation Act specifically defines the phrase "mineral deposit" as "an accumulation of mineral matter in the form of consolidated rock, unconsolidated material, [and] solutions . . . *exclud[ing] . . . oil and gas.*"[27]

¶ 24 In the instant case, both parties have cited to these sections of the code and have argued that these definitions support their respective interpretations of "mineral deposits." But rather than support the proposition that the phrase "mineral deposits" generally encompasses or excludes oil and gas, these statutory definitions merely reinforce

the conclusion that whether oil and gas are appropriately deemed mineral deposits depends on the context in which the phrase is used.[28] Moreover, these varied definitions provide further support for our conclusion that it is reasonable to interpret "mineral deposits" so broadly as to include oil and gas, or so narrowly as to exclude these substances.

¶ 25 In sum, the phrase "mineral deposits" does not have a single fixed meaning. Instead, the phrase may be used in a variety of ways and must be interpreted based on the context in which it is used. Because the context of section 501(6)(a) does not indicate whether the Legislature intended the phrase "mineral deposits" to include oil and gas, and because the Legislature has defined the phrase in other sections of the code as both including or excluding oil and gas, we conclude that the phrase is susceptible to two reasonable interpretations. Based on these competing reasonable interpretations, we hold that section 501(6)(a)'s use of the phrase "mineral deposits" is ambiguous.

### B. Narrowly Interpreting Section 501(6)(a) Would Not Create an Absurd Result

¶ 26 In opposition to the conclusion that section 501(6)(a) is ambiguous, Marion and the Trust contend that narrowly interpreting the phrase "mineral deposits" would create an absurd result. We disagree. Generally, when interpreting statutes we seek to avoid interpretations "which render some part of a provision nonsensical or absurd."[29] Thus, when " 'statutory language . . . presents the court with two alternative readings, we prefer the reading that avoids absurd results.' "[30] In defining the parameters of what constitutes an absurd result, we have noted that such a "result must be so absurd that the legislative body which authored the legislation could not have intended it."[31]

26. *Id.* § 53C–1–103(4) (2009).

27. *Id.* § 40–8–4(6) (2010) (emphasis added).

28. *See Carrier*, 2004 UT 98, ¶ 34, 104 P.3d 1208.

29. *O'Dea v. Olea*, 2009 UT 46, ¶ 32, 217 P.3d 704 (internal quotation marks omitted).

30. *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 73, 210 P.3d 263 (quoting *State ex rel. Z.C.*, 2007 UT 54, ¶ 15 n. 5, 165 P.3d 1206).

31. *State ex rel. Z.C.*, 2007 UT 54, ¶ 13, 165 P.3d 1206.

¶ 27 Here, Marion and the Trust argue that narrowly interpreting "mineral deposits" would create an "irrational and absurd [result] in at least two distinct manners." First, they contend that this interpretation would permit "one landowner [to] effectively prevent the Trust from accessing and exploiting its oil and gas deposits for the benefit of the Trust." Second, they claim that it "would give parties the power of condemnation to store oil and gas under section 501(6)(d) but not to produce it under section 501(6)(a)." We find these arguments unpersuasive.

¶ 28 While a narrow interpretation of the phrase "mineral deposits" may deprive Marion of one means of accessing its leased oil and gas deposits, Marion still has other available means of accessing and exploiting them. For instance, Part 4 of SITLA—which governs the minerals leased by Marion—provides that "[a] mineral lessee ... has the right *at all times* to enter upon the leasehold for prospecting, exploring, developing, and producing minerals and *shall have reasonable use of the surface*." [32]

¶ 29 The same section also provides specific means of gaining access to privately owned property such as "securing the written consent or waiver of the surface owner or lessee" [33] or "execut[ing] ... a ... bond." [34] Thus, while Marion may not have authority to permanently deprive KFJ of its property through condemnation, Marion may have a statutory right to enter the portions KFJ's property on which Marion has mineral rights so long as it complies with the requirements contained in Part 4 of SITLA.

¶ 30 Because Marion has alternative avenues of access to its leased mineral rights, we do not believe that it would be absurd to interpret section 501(6)(a)'s use of the phrase "mineral deposits" as not encompassing oil and gas. In further support of this conclusion, we also note that we do not think that

such a narrow interpretation would create a "result ... so absurd that the legislative body which authored the legislation could not have intended it." [35] Indeed, given the importance of private property rights and the extreme burden associated with permanently condemning a property owner's land, we believe the Legislature could reasonably have intended to require parties to use means less intrusive than building a permanent road to transport oil and gas across private property—such as securing an easement or condemning a smaller portion of land to build pipelines. For these reasons, we conclude that narrowly interpreting the phrase "mineral deposits" so as not to include oil and gas would not create an absurd result.

*C. Because We Find That Section 501(6)(a) Is Ambiguous, We Strictly Construe Its Language in Favor of KFJ*

¶ 31 Given our conclusion that section 501(6)(a) is susceptible to two reasonable interpretations, and that neither of these interpretations would create an absurd result, we must turn to other rules of statutory construction. As discussed above, because the exercise of eminent domain results in the derogation of a property owner's right to use and enjoy his land, we strictly construe any ambiguity in statutory language purporting to grant the power of eminent domain in favor of the property owner and against the condemning party.[36] Strictly construing the ambiguity at issue in this case in favor of KFJ compels us to conclude that section 78B–6–501(6)(a) of the Utah Code does not provide Marion authority to condemn KFJ's land to build a road to access its leased oil and gas deposits.

¶ 32 In reaching this conclusion, we recognize that Marion and the Trust have advanced public policy arguments in support of their interpretation of section 501(6)(a). But

32. UTAH CODE ANN. § 53C–2–409(2)(a) (2009) (emphases added).

33. *Id.* § 409(3)(a).

34. *Id.* § 409(3)(c).

35. *See State ex rel. Z.C.*, 2007 UT 54, ¶ 13, 165 P.3d 1206.

36. *See, e.g., Bertagnoli*, 215 P.2d at 628 ("The right of eminent domain, being in derogation of the rights of individual ownership in property, has been strictly construed by the courts so that no person will be wrongfully deprived of the use and enjoyment of his property.").

given our rules of statutory construction in the context of eminent domain statutes, we feel these arguments should be directed to the Legislature rather than to this court.[37] Thus, without considering these policy concerns, and relying solely on our eminent domain canon of interpretation, we resolve section 501(6)(a)'s ambiguity against Marion and conclude that the section does not provide Marion with the authority it seeks to exercise.

## CONCLUSION

¶ 33 In interpreting statutory language, our primary goal is to give effect to the legislature's intent. To accomplish this goal, we begin by looking to the statute's plain language. When the language of a statute purporting to grant the power of eminent domain is ambiguous, we strictly construe all ambiguities against the condemning party.

¶ 34 In the instant case, we conclude that section 501(6)(a)'s use of the phrase "mineral deposits" is ambiguous because it may be understood to have at least two reasonable meanings: either including or excluding oil and gas. Given this ambiguity, we must construe the statute in favor of KFJ and against Marion. Based on this rule of strict construction, we hold that section 78B-6-501(6)(a) of the Utah Code does not provide Marion with authority to condemn land to build a road to access its leased oil and gas deposits. We therefore affirm the district court's dismissal of Marion and the Trust's condemnation action.

¶ 35 Chief Justice DURHAM, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT's opinion.

---

37. *See, e.g., State v. Ireland,* 2006 UT 82, ¶ 21, 150 P.3d 532 ("[S]hould any part of our interpretation bring[] about a result contrary to the intention of the Legislature, it is a matter for the Legislature to remedy." (second alteration in original) (internal quotation marks omitted)); *Kincheloe v. Coca-Cola Bottling Co. of Ogden,* 656 P.2d 440, 442 (Utah 1982) ("[A]ny recommended change to [statutory] law should be addressed to the legislature and not the court.").

Justice LEE, dissenting:

¶ 36 As the court today indicates, the statutory term "mineral deposits" is sometimes used narrowly to refer to solid mineral ores and sometimes used broadly to encompass oil and gas reserves. The question presented in this case is which of these two meanings to ascribe to that term as it appears in the eminent domain statute, Utah Code section 78B-6-501(6). I respectfully dissent from the court's resolution of that question on the basis of a "canon" of narrow construction of eminent domain provisions. Instead of falling back on that canon, I would decide which meaning of "mineral deposits" is reasonably conveyed by the term as it appears in this particular statute, and would hold that the term in that context encompasses oil and gas and not just solid ore.

¶ 37 In my view, we should not interpret eminent domain statutes "narrowly" with a thumb on the scale in favor of private property owners or "liberally" in favor of the condemning authority (as courts have also sometimes suggested). We should interpret them fairly and reasonably in an attempt to find the precise balance of these competing interests that was adopted by the legislature. When courts resort too hastily to substantive canons, they run the risk of substituting their own policy views for the balance struck by the legislature. It seems to me that the majority's canon does just that. I respectfully dissent from the use of the canon and would find that the statutory text here favors the condemning authority by authorizing the construction of roads to facilitate the mining of oil and gas.

I

¶ 38 As the majority indicates, this court and others have sometimes indicated an inclination to read eminent domain statutes narrowly.[1] Although this principle often

---

1. *See, e.g., Bertagnoli v. Baker,* 117 Utah 348, 215 P.2d 626, 628 (1950) ("The right of eminent domain, being in derogation of the rights of individual ownership in property, has been strictly construed by the courts so that no person will be wrongfully deprived of the use and enjoyment of his property."); *see also Salt Lake Cnty. v. Murray City Redevelopment,* 598 P.2d 1339, 1345 (Utah 1979) ("Statutes conferring the power of condemnation under the right of eminent do-

flies under the banner of a "canon," it is not the kind of canon we ordinarily employ in ascertaining statutory meaning. By "canon," we usually have reference to the kinds of "tools that guide our construction of statutes in accordance with common, ordinary usage and understanding of language." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 19, 248 P.3d 465. Such linguistic canons are often uncontroversial, since they aid in the judicial attempt to assign meaning to statutory terms in a predictable fashion that respects reasonable reliance interests of the parties regulated by statute and likewise validates legislators' expectations of the import of their legislative text.

¶ 39 The "canon" embraced by the majority is not of this ilk. There is no reason to expect that the common, ordinary usage of language regarding the eminent domain power is typically exaggerated, necessitating a "narrow" construction to determine its true meaning. Presumably, the legislature meant what it said when it prescribed the terms of the eminent domain authority to build roads to access "mineral deposits." If so, we undermine the reasonable reliance interests of the parties regulated by the statute if we read it narrowly, just as we also invalidate legislative intent on the matter.

¶ 40 I recognize that this and other courts have sometimes "canonized" other principles of construction that have nothing to do with identifying ordinary usage or meaning. Such canons are *substantive*, in that they seek to advance values or principles exogenous to the goal of identifying legislative intent.[2] Courts

ought to tread lightly in canonizing these sorts of principles, as they threaten to impinge on the policymaking domain of the legislature.

¶ 41 I do not mean to suggest that all substantive canons are inappropriate. Such canons are least problematic when they advance policies that emanate from some other source of positive law like the Constitution. When courts narrowly construe federal statutes that impinge on traditional state functions,[3] for example, they protect values inherent in constitutional principles of federalism. In such cases, courts are advancing the values or principles canonized in the Constitution, not in the mind or heart of the judiciary. Courts are also on solid ground when they embrace substantive canons that claim a long, unbroken pedigree. When we construe statutes to avoid constitutional doubts[4] or to favor criminal defendants, for example, we are embracing substantive canons embraced long and wide by courts everywhere. Such canons may be justified on the ground that the legislature acts in full knowledge of them, so we may properly assume that it took these canons into account in adopting the statutory language it chose.[5]

¶ 42 The canon embraced by the majority is not such a canon. Though "this rule of strict construction [is] supported by our precedent," *supra* ¶ 16, our cases also identify a counter-canon. In *Monetaire Mining Co. v. Columbus Rexall Consolidated Mines Co.*, this court stated that "it is generally agreed that where the right of eminent domain is

---

main are strictly construed.") (internal quotation marks omitted); *Great Salt Lake Auth. v. Island Ranching Co.*, 18 Utah 2d 45, 414 P.2d 963, 968 (1966) (Callister, J., dissenting), *rev'd on reh'g*, 18 Utah 2d 276, 421 P.2d 504 (1966).

**2.** Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L.Rev. 109, 110 (2010) ("[I]t is generally recognized that substantive canons advance policies independent of those expressed in the statute.").

**3.** *Gregory v. Ashcroft*, 501 U.S. 452, 460–61, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." (internal quotation marks omitted)).

**4.** *See Ex Parte Randolph*, 20 F.Cas. 242, 254 (Marshall, Circuit Justice) (C.C.D.Va.1833) (No. 11,558) ("If the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.").

**5.** Barrett, *supra* note 2, at 159 ("To the extent that these canons are well-established, they are conventions with which the interpretive community of lawyers is conversant."); John F. Manning, *Clear Statement Rules and the Constitution*, 110 Colum. L.Rev. 399, 406 (2010) ("[A substantive] canon might nonetheless reflect a deeply embedded Anglo–American legal tradition . . .—a convention against which Congress may have legislated from the beginning of the Republic.").

granted for a particular purpose, then the statute must be given a liberal construction in furtherance of such purpose." 53 Utah 413, 174 P. 172, 175 (1918) (emphasis added). *See also Utah Copper Co. v. Stephen Hayes Estate, Inc.,* 83 Utah 545, 31 P.2d 624, 627 (1934) (requiring courts to construe mining statutes "with as much liberality as its language may permit in order to carry out the purpose which the legislative power had in mind"). In *Monetaire Mining,* we suggested that "[t]he importance of encouraging the mining industry of this state must be kept in view," and that a "reasonable, fair, just, *broad, and liberal* view should be taken by the court" in interpreting eminent domain statutes. 174 P. at 176 (quoting *Douglass v. Byrnes,* 59 F. 29, 32 (D.Nev.1893)).

¶ 43 The "liberal construction" canon endorsed in *Monetaire Mining* and *Utah Copper* has never been overruled and has been cited in other jurisdictions.[6] Without a single mention of this established precedent, the court did an about-face years later, holding that eminent domain statutes should be "strictly construed." *Bertagnoli v. Baker,* 117 Utah 348, 215 P.2d 626, 627–28 (1950). *Bertagnoli,* which is relied upon by the majority, completely ignores *Monetaire Mining* and *Utah Copper* and fails to cite a single Utah authority for its counter-canon. Thus, *Bertagnoli* was not a recognition of a longstanding substantive canon endorsed by extensive precedent; it was simply a judicial rebalancing of the interests the court had evaluated differently just years earlier.

¶ 44 The majority responds by suggesting that the *Monetaire Mining* rule "does *not* apply to ambiguous eminent domain statutes," but instead "applies *only* when a statute '*clear[ly]* and *explicit[ly]* ... grants the right of eminent domain for [a particular] purpose.'" *Supra* ¶ 16 n. 14. Thus, according to the court, "these two rules are designed to resolve entirely distinct issues," and do not

"conflict with one another." *Id.* This strikes me as untenable. It seems to me the majority has adopted an arbitrary interpretive regime—one in which we broadly construe *unambiguous* eminent domain statutes, while narrowly construing *ambiguous* ones. But the notion of broad construction of unambiguous language makes no sense to me. The rule of lenity prescribes the narrow construction of ambiguous penal laws against the state, but we would never broaden unambiguous penal laws, throwing an extra couple of months onto a convict's sentence for good measure. If the language is clear, express, and unambiguous, there is no reason to resort to a broad or narrow construction.[7]

¶ 45 Nor is it correct to suggest that the *Monetaire Mining* rule applied *only* where a statute is clear and express. In *Utah Copper,* the court was faced with the question whether a natural "gulch" was a "ditch, flume, aqueduct, or tunnel ... within the meaning of the [eminent domain] statute." 31 P.2d at 627. Though the parties presented a number of "[c]ases and authorities" in favor of and against this construction, the *Utah Copper* court held that "we do not find it necessary to enter into a discussion concerning the meaning of those terms or to take sides in that controversy; for, so far as the present point is concerned, the case may be decided without reference to any of those terms." *Id.* We then declared that an eminent domain statute "must be construed, wherein it may require construction ... with as much liberality as its language may permit." *Id.* Thus, the *Utah Copper* court found the statute to be clear only *after* resorting to its broadening canon of construction, not vice versa.

¶ 46 Rather than creating a unified interpretive regime, it seems to me that the rule in *Monetaire Mining* and the one announced in *Bertagnoli* are precisely at odds with each

---

**6.** *See, e.g., Freeman Gulch Mining Co. v. Kennecott Copper Corp.,* 119 F.2d 16, 19–20 (10th Cir. 1941) ("A statute granting the right of eminent domain for a particular purpose must be liberally construed in furtherance of such purpose." (citing *Monetaire Mining,* 174 P. at 175)); *State ex rel. Standard Slag Co. v. Fifth Judicial Dist. Court,* 62 Nev. 113, 143 P.2d 467, 469 (1943) (same).

**7.** *Hanchett v. Burbidge,* 59 Utah 127, 202 P. 377, 379–80 (1921) ("We must be guided by the law as it is.... When language is clear and unambiguous, it must be held to mean what it expresses, and no room is left for construction.").

other. They are not canons at all, but self-canceling "thrust-and-parry" rules employed to advance judicial (and not necessarily legislative) policy preferences.[8]

¶ 47 Even assuming that the rule of strict construction in *Bertagnoli* is now settled, I think it important to clarify what it settled. Cases like *Monetaire Mining* recognize that "the object and end of all government is to promote the happiness and prosperity of the community by which it is established; and it can never be assumed, that the government intended to diminish its power of accomplishing the end for which it was created." *Charles River Bridge v. Warren Bridge*, 36 U.S. (11 Pet.) 420, 547, 9 L.Ed. 773 (1837). Under this rationale, courts have held that "[w]hile the rights of private property are sacredly guarded, we must not forget, that the community also have rights, and that the happiness and well-being of every citizen depends on their faithful preservation." *Id.* at 548. The *Bertagnoli* court balanced these interests differently, concluding that strict construction of eminent domain statutes is required because eminent domain operates "in derogation of the rights of individual ownership in property." 215 P.2d at 628.

¶ 48 The choice between the *Monetaire Mining* and *Bertagnoli* canons is purely a matter of policy—of whether to favor communitarian governmental interests on the one hand or private property interests on the other. That choice falls squarely in the legislative domain. We have no proper say in the matter, except to interpret and apply the balance of these interests as codified by the legislature.[9]

¶ 49 Thus, it strikes me as incongruous to foreclose the parties' "public policy arguments" *in light of* our "eminent domain canon of interpretation." *See supra* ¶ 32. This canon, like so many other so-called "substantive canons," is nothing but policy.[10] Absent any legislative or constitutional directive, we have concluded that we will resolve cases in favor of a particular party based exclusively on *our own* policy rationale. Ultimately, it seems to me that the court is telling the parties that we won't listen to *their* policy concerns because we favor our own.

¶ 50 The point is not that *Monetaire Mining* had it right and *Bertagnoli* got it wrong. Both are wrong in that they arrogate to the courts the power to weigh competing policy interests and to select winners and losers. This is a legislative and not a judicial function.

¶ 51 In any event, the canon of interpretation employed by the majority is ultimately incoherent when applied to a case like this one, where the interests of two private property holders are at issue. The court justifies its strict construction canon by noting that "'[t]he right of eminent domain, being in derogation of the right of *individual* ownership in property, has been strictly construed by the courts so that *no person* will be wrongfully deprived of the use and enjoyment of his property.'" *See supra* note 13 (emphases added) (quoting *Bertagnoli*, 215 P.2d at 627). This rationale seems to juxta-

---

**8.** Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About how Statutes Are to Be Construed*, 3 Vand. L.Rev. 395, 401–06 (1950) (warning of the risk of arbitrariness in the face of various "opposing canons" characterized as "thrust" and "parry" moves by the court).

**9.** *See Griswold v. Connecticut*, 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) ("We do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions."); *see also Hoyer v. State*, 2009 UT 38, ¶ 34, 212 P.3d 547 ("Our inquiry is not what the legislature should do, but rather what the legislature has done.").

**10.** James J. Brudney, *Canon Shortfalls and the Virtues of Political Branch Interpretive Assets*, 98 Calif. L.Rev. 1199, 1205 (2010) ("Substantive canons are grounded not in judgments about the conventional understanding of language, but in an array of judicially generated policy concerns."); Barrett, *supra* note 2, at 17 ("Substantive canons ... can challenge legislative supremacy insofar as their purpose is to promote policies external to a statute."); William N. Eskridge, Jr. & Philip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking*, 45 Vand. L.Rev. 593, 595–96 (1992) ("The substantive canons do reflect some overall tendency or slant in the Court's interpretation of statutes. That is, unlike the linguistic canons or the referential canons, the substantive canons are not policy neutral. They represent value choices by the Court.").

pose the interests of the "individual" or private property owner against those of the state actor.[11] But even if the land ownership of KFJ Ranch Partnership is the type of "individual property ownership" that the majority's canon of construction was designed to protect, Marion Energy Corporation likewise has a property interest in its oil and gas leases. Neither the statute nor our constitution provides a basis for preferring one of these corporate property interests over the other.[12]

## II

¶ 52 In my view, the fact that reasonable arguments can be made on both sides of a statutory question cannot be enough to justify our reservation of judgment as to "whether the Legislature intended for the term to encompass oil and gas deposits." *Supra* ¶ 25. That is the question of interpretation presented for our review, and it is our responsibility to decide it even if we deem it a close call. If reasonable arguments on both sides were enough for us to find ambiguity, most all of our statutory cases would become a free-for-all, in which the statutory text is no longer the guide and the court may " 'seek guidance' " not just from substantive canons of construction but also " 'from legislative history and relevant policy considerations.' " *Supra* ¶ 15 (quoting *Taylor ex rel. Taylor v. Ogden City Sch. Dist.*, 927 P.2d 159, 167

(Utah 1996) (Durham, J., dissenting)). We ought to be wary of seeking such "guidance," as it treads dangerously close to (if not crossing) the line that separates our limited role of interpreter from the legislative role of policymaker. But at a minimum, it seems to me that before we look to such sources of "guidance" it is our duty to determine the *best* interpretation of the statutory text in light of its surrounding linguistic and legal context.[13] I certainly would not look past the text at the mere sight of alternative arguments cutting in opposite directions. *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 13, 248 P.3d 465 ("The fact that the statutory language may be susceptible of multiple meanings does not render it ambiguous....").

¶ 53 Granted, the meaning of the term "mineral deposits" is " 'largely contextual.' " *Supra* ¶ 19 (quoting *Carrier v. Salt Lake Cnty.*, 2004 UT 98, ¶ 32, 104 P.3d 1208). But in my view the relevant context cannot be limited to the acknowledgment of reasonable, competing arguments from the structure of the statute or from alternative uses of the statutory terminology in parallel provisions. The relevant context is broader, encompassing the linguistic and structural considerations examined by the majority as well as practical implications that the court dismisses under the misplaced notion that they do not constitute an "absurd result." *Supra* ¶ 30. I read these relevant contextual cues

---

11. Presumably, the *Bertagnoli* canon of strict construction was born of a presumption against the vast, incorporeal government and in favor of the personalized, sympathetic individual. If so, that merely underscores the impropriety of this canon, for such favoritism has no home in the judiciary. In this case, in any event, it is simply incoherent as it operates not against the government but to favor one private property holder and against another.

12. "Although Marion and the Trust have property interests at issue in this case," the majority asserts that "only KFJ faces the possibility of being permanently deprived of its property" and that "protection of private property owners against such unauthorized condemnations is the very purpose for which the rule of strict construction announced in *Bertagnoli* was created." See *supra* note 16. Both of these propositions may be true, but I do not see how the latter follows from the former. A deprivation of property is a deprivation of property, and I see nothing in the *Bertagnoli* rule that meaningfully dis-

tinguishes between temporary and permanent deprivations. If an ambiguous eminent domain statute allowed for only the *temporary* condemnation of private property, I assume that the majority would still resolve these ambiguities against the party seeking condemnation. Ultimately, there is no property protection rationale that supports the invocation of a strict-construction canon in this case. Instead, the canon ends up favoring one type of property ownership over another. That strikes me as even more troubling—and more arbitrary—than the canon as applied in *Bertagnoli*.

13. Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L.Rev. 527, 537 (1947) ("When we talk of statutory construction we have in mind cases in which there is a fair contest between two readings, neither of which comes without respectable title deeds. A problem in statutory construction can seriously bother courts only when there is a contest between probabilities of meaning.").

to dictate a construction of "mineral deposits" that includes oil and gas reserves.

A

¶ 54 I agree with the majority that the phrase "mineral deposits" in Utah Code section 78B–6–501(6)(a) is susceptible of two alternative interpretations—one that excludes oil and gas and one that does not. Each interpretation coincides with a definition commonly found in dictionaries. First, a "mineral" may be defined as "[a] naturally occurring, homogeneous inorganic solid substance having a definite chemical composition and characteristic crystalline structure, color, and hardness." [14] This is a scientific definition used to classify as "minerals" those solid, inorganic substances that share a common crystalline structure—a definition that would exclude oil and gas.

¶ 55 Second, a "mineral" may also be defined as "[a] subsurface material that is explored for, mined, and exploited for its useful properties and commercial value." [15] This second definition is consistent with the legal use of the terms "mineral interest," and "mining," both of which may include the notion of oil and gas. The second definition refers not to the material state of the substance extracted, but to its economic purpose or value. While the first definition is employed to denote a scientific classification, the second is used in connection with mining or property rights.

¶ 56 The question presented in this case is which of these two definitions to impute to the term "mineral deposits" in the eminent domain statute. Neither definition is inherently "narrow" or "broad." They are simply contextual. Our role in this case is to decide which one is reasonably conveyed by the language, structure, and context of the eminent domain statute.

¶ 57 I believe that a reasonable person familiar with the linguistic and legal context of the statute would understand the statutory term "mineral deposits" to be used in its mining or property rights sense, not in its scientific classification sense. The statute is, after all, a property rights provision. It accords an owner of mineral deposits the right to condemn land to build a road to access those deposits. In this context, a party acquiring a valuable mineral right would reasonably understand his right to include the statutory right of condemnation, regardless of whether the resource is in solid, crystalline form or in the form of liquid oil or natural gas.[16]

**14.** AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1118 (4th ed. 2009); *see also* BLACK'S LAW DICTIONARY 1084 (9th ed. 2009) (defining *mineral* as "1. Any natural inorganic matter that has a definite chemical composition and specific physical properties that give it value," most of which "are crystalline solids"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1487 (3d ed. 1981) (defining *mineral* as "1a: a solid homogenous crystalline chemical element or compound ... that results from the inorganic processes of nature and that has a characteristic crystal structure and chemical composition or range of compositions"); AM GEOLOGICAL INST., DICTIONARY OF MINING, MINERAL, AND RELATED TERMS 347 (2d ed. 1997) (defining *mineral* as "(a) A naturally occurring inorganic element or compound having an orderly internal structure and characteristic chemical composition, crystal form, and physical properties").

**15.** BLACK'S LAW DICTIONARY, *supra* note 14, at 1084; *see also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, *supra* note 14 at 1118 (defining *mineral* as "2. Any of various natural substances, such as: ... [a]n organic derivative, such as coal or petroleum ... that is extracted or obtained from the ground ... and used in economic activities"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIO-

NARY, *supra* note 14 at 1487 (defining *mineral* as "b: any of various naturally occurring homogenous or apparently homogeneous and usu. but not necessarily solid substances (as ore, coal, ... petroleum, water, natural gas, ...) obtained for man's use usu. from the ground"); AM. GEOLOGICAL INST. *supra* note 14 at 347 (defining *mineral* as "(d) any natural resource extracted from the earth for human use; e.g., ores, salts, coal, or petroleum"); 9 OXFORD ENGLISH DICTIONARY 806 (2d ed. 1989) (defining *mineral* as "1.a. Any substance which is obtained by mining; a product of the bowels of the earth").

**16.** *See* BLACK'S LAW DICTIONARY, *supra* note 14 at 1084 (defining *mineral interest* as "Oil & gas. The right to search for, develop, and remove minerals from land or to receive a royalty based on the production of minerals. Mineral interests are granted by an oil-and-gas lease."); *see also Uintah Oil Ass'n v. Cnty. Bd. of Equalization*, 853 P.2d 894, 895 (Utah 1993) ("Although the property is the subject of patented *oil shale mining claims*, it has *not been used for mining* and *no minerals* have been extracted therefrom." (emphases added)); *Bennion v. Pennzoil Co.*, 826 P.2d 137, 137 (Utah 1992) (characterizing oil and gas rights as "mineral interests"); *Cowling*

¶ 58 In a contract setting, most courts hold that a contractual "conveyance or reservation of the 'minerals' will include oil, gas and petroleum products, unless a contrary intent is manifested on the face of the instrument."[17] This court articulated that view over a century ago, stating that "[t]he term 'minerals' in a grant includes prima facie every substance that can be got underneath the surface of the earth for profit." *Nephi Plaster & Mfg. Co. v. Juab Cnty.*, 33 Utah 114, 93 P. 53, 56 (1907) (internal quotation marks omitted).[18]

¶ 59 Thus, when a party acquires a mineral right, it reasonably understands that its rights extend to all valuable natural resources under the ground in question. The seller of such a right would hardly be heard to contend that oil and gas reserves were not conveyed because they are not solid, crystalline substances and thus do not satisfy the scientific definition of "mineral."

¶ 60 Because the eminent domain statute effectively allocates property rights in mineral deposits, the statutory term should be interpreted the same way it would be in a contract. This court has previously said as much, indicating that "where we find the terms 'mines and minerals' used in grants or in reservations, in instruments of conveyance, *in statutes or Constitutions*, under the modern construction, the former is not limited to mere subterranean excavations or workings, nor is the latter limited to the

metals or metalliferous deposits." *Id.* at 56 (emphasis added).

¶ 61 The mining or property rights notion of "mineral" is confirmed by the language of the eminent domain statute. Under the statute, land may be condemned to build a road to "facilitate the milling, smelting, or other reduction of ores, or the working of mines." UTAH CODE ANN. § 78B–6–501(6)(a) (2008). The statute is aimed at facilitating the extraction of minerals for commercial purposes. And it refers to a number of processes by which "subsurface material" is "exploited for its useful properties and commercial value."[19] Given this context, I think that the trade usage of *mineral*—the one that encompasses the notion of oil and gas—is unambiguously conveyed by this statute.[20]

B

¶ 62 I also find the structure of the eminent domain statute instructive. As I read the subsections of section 501(6), it seems apparent that subsection (a) addresses condemnation for the purpose of *accessing* various natural resources while subsections (b) through (f) deal with condemnation for the purpose of *storage and transportation.* These two sets of provisions use different terminology to refer to the types of natural resources to be accessed, stored, or transported, but I see no reason to read subsec-

v. Bd. of Oil, Gas & Mining, Dep't of Natural Resources, 830 P.2d 220, 225 (Utah 1992); BLACK'S LAW DICTIONARY, *supra* note 14 at 1084 (defining *mining* as "[t]he process of extracting ore or minerals from the ground; the working of a mine. This term also encompasses oil and gas drilling.").

17. RICHARD W. HEMINGWAY, THE LAW OF OIL AND GAS § 1.1, at 1 (3d ed. 1991); *see also id* § 1.2, at 8 ("A conveyance or reservation of 'minerals' or 'oil, gas and other minerals' will generally include substances having a special value apart from the land itself, whose removal will not substantially interfere with surface usage, and which are traditionally not associated with surface ownership."); *Wall v. Shell Oil Co.*, 209 Cal.App.2d 504, 25 Cal.Rptr. 908, 915 (Dist.Ct. App.1962) ("We believe that the court was correct in applying the majority rule in the United States that a broad transfer of the mineral estate includes gas and oil, unless the contrary intent

appears...."); *Ky. W. Va. Gas Company v. Browning*, 521 S.W.2d 516, 517 (Ky.1975); *Weaver v. Richards*, 156 Mich. 320, 120 N.W. 818, 819 (1909); *Stocker & Sitler, Inc. v. Metzger*, 19 Ohio App.2d 135, 250 N.E.2d 269, 275 (1969).

18. *See also W. Dev. Co. v. Nell*, 4 Utah 2d 112, 288 P.2d 452, 454 (1955).

19. *See supra* ¶ 55.

20. *Cf. Burke v. S. Pac. R.R. Co.*, 234 U.S. 669, 679, 34 S.Ct. 907, 58 L.Ed. 1527 (1914) ("[A]ssuming that, when subjected to a strictly scientific test, petroleum is not a mineral, we think that is not the test contemplated by the statute. It was dealing with a practical subject in a practical way, and we think it used the words 'mineral lands,' and intended that they should be applied, in their ordinary and popular sense. In that sense, as before indicated, they embrace lands chiefly valuable for petroleum.").

tion (a)'s general reference to "mineral deposits" to exclude oil and gas reserves.

¶ 63 Under subsection (a), eminent domain may be exercised for the construction of "roads, railroads, tramways, tunnels, ditches, flumes, pipes, and dumping places to facilitate the milling, smelting, or other reduction of ores, or the working of mines, quarries, coal mines, or mineral deposits including minerals in solution." UTAH CODE ANN. § 78B–6–501(6)(a). In context, it seems to me that the reference to "mineral deposits" is broadening, not limiting. The provision expressly authorizes condemnation for roads for "the working of mines, quarries, [and] coal mines." Surely that would encompass the kind of solid ore that the majority deems "mineral deposits" to be aimed at. So it seems to me that "mineral deposits, including minerals in solution," reasonably would be understood in context to extend beyond solid ore to include liquid oil and gas reserves.

¶ 64 For me, the statutory scheme thus confirms that the legislature was using "mineral deposits" in its mining or property rights sense, not by way of limitation to a particular scientific classification based on the state of the mineral's matter. In fact, the statutory context seems to eschew any limitation based on a mineral's material state. We know that "minerals in solution" are included, so at least some forms of liquid resources are covered by the statute. UTAH CODE ANN. § 78B–6–501(6)(a). And I assume that even the majority would deem tar sand to be covered, as it is in solid form and thus presumably counts as a mineral even under the definition based on scientific classification.

¶ 65 Ultimately, then, the statute cannot reasonably be read to foreclose condemnation in this case simply on the material state of the natural resource in question. If some liquid resources are covered (as the "minerals in solution" provision indicates), then it would seem arbitrary to exclude a liquid resource like oil. And if tar sand counts, any exclusion of oil is even more arbitrary. It makes much more sense in context to treat "mineral deposits" to encompass any valuable natural resource under the ground, regardless of how it might be scientifically classified based on its material state.

¶ 66 It is true, as KFJ and the majority note, that subsection (d) makes express reference to oil and gas in authorizing the use of eminent domain to build "gas, oil or coal pipelines, tanks or reservoirs." *Supra* ¶ 21 (citing UTAH CODE ANN. § 78B–6–501(6)(d)). But I cannot see how this express reference to oil and gas is any indication that "the Legislature did not intend for oil and gas to be provided for in subsection 6(a)." *Supra* ¶ 21. Rather than limiting the expanding term "mineral deposits," it seems to me that the specific reference to gas, oil, and coal in subsection (d) simply limits the kinds of pipelines, tanks, and reservoirs that may be the proper subject of the power of eminent domain under that provision. I see no inconsistency, and no reason to read the specific reference to oil and gas in subsection (d) to imply their exclusion in subsection (a).[21]

### C

¶ 67 The statute's adoption of the mining or property rights notion of "mineral" is

---

21. The majority's approach ultimately boils down to the proposition that the legislature could have been clearer if it had intended to include oil and gas in the term "mineral deposits." Our statutory precedents are riddled with similar assertions. *See e.g., State v. Wallace*, 2006 UT 86, ¶ 12, 150 P.3d 540 ("Had that been the Legislature's intent, however, it easily could have said so...."); *Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶ 17, 54 P.3d 1177 ("Had the legislature intended to exclude business entities that engage in both retail and wholesale selling ..., it could have specified that dealer means only those business entities that engage exclusively in the business of retailing. It did not do so."). I find such conclusions unhelpful. It may

well be that if the legislature had meant to say "x," it could have said so more explicitly. But that almost never advances the ball analytically. In any case that warrants our careful attention, it will most always be true that the legislature could have spoken more precisely if it had anticipated the precise question before the court. But of course the legislature cannot in fact anticipate all issues that might arise in the future, which is the main reason we judges have jobs. So I acknowledge that the legislature could have said "mineral deposits, including oil and gas." But it also might have said "mines, quarries, coal mines, or solid ore deposits." It said neither, and it helps us not at all to imagine an easier case in which the legislature spoke more clearly.

further confirmed by another structural feature of the eminent domain statute. KFJ has not explained—and I cannot imagine—a rationale for the legislature to authorize eminent domain for the *transportation and storage* of oil and gas reserves without a parallel authorization to facilitate *access* to such resources. Without some statutory indication to the contrary, it seems to me unreasonable to assume that the legislature would have endorsed the condemnation of land to build "pipelines, tanks or reservoirs, including ... for the underground storage of natural gas," UTAH CODE ANN. § 78B–6–501(6)(d), without also endorsing the condemnation of land to build a road to those pipelines and stores. In fact, as KFJ conceded at oral argument, it would be impossible to build a pipeline to an oil or gas reserve without also constructing a road in the process.

¶ 68 The majority suggests a possible explanation for this supposed dichotomy: "[T]he Legislature could reasonably have intended to require parties to use means less intrusive than building a permanent road to transport oil and gas across private property—such as ... condemning a smaller portion of land to build pipelines." *Supra* ¶ 30. But if condemnation of land for a pipeline is permitted, there is no reason to expect that the construction of the pipeline would involve the condemnation of "a smaller portion of land" than that required to build a road. I would think that the opposite would ordinarily be the case, particularly given that most any pipeline would presumably require the construction of a road (not just for construction but also for access and maintenance). If so, it makes little sense to presume that the legislature would endorse condemnation for oil and gas pipelines but not roads.

¶ 69 The majority's response to this is its conclusion that this result is not "so absurd that the legislative body which authored the legislation could not have intended it." *Supra* ¶ 30 (quoting *State ex rel. Z.C.*, 2007 UT 54, ¶ 13, 165 P.3d 1206). But this conclusion conflates two separate rules of construction related to absurdity. We have, at times, relied on the so-called "absurdity" doctrine in cases where we consider whether to reject the otherwise "plain meaning" of statutory text. *State ex rel. Z.C.*, 2007 UT 54, ¶ 13, 165 P.3d 1206.[22] But the question in such cases is whether the practical implications of the *plain* text (not a text with two interpretations) are so absurd and ridiculous that we are convinced that the legislature could not have meant what it said.

¶ 70 At other times, where a statute is susceptible of two interpretations, we have used the absurd result of one interpretation as evidence that the other interpretation ought to control.[23] We have even gone so far as to characterize this approach as a "related but separate canon of statutory interpretation" to the absurdity doctrine addressed above. Rather than implicating the notion of "absurdity," this second approach is better understood to suggest that where two interpretations present themselves, we consider the practical consequences of each in evaluating which one more reasonably would be understood by a person familiar with the statute in its legal and linguistic context. *Olsen*, 2011 UT 10, ¶ 20. The circumstances of this case, where two reasonable interpretations present themselves, implicate this second approach. The unusual statutory scheme that would allow leaseholders to seek condemnation for the transportation and

22. *See also Savage v. Utah Youth Vill.*, 2004 UT 102, ¶ 18, 104 P.3d 1242 ("An equally well-settled caveat to the plain meaning rule states that a court should not follow the literal language of a statute if its plain meaning works an absurd result or is 'unreasonably confused, inoperable, or in blatant contravention of the express purpose of a statute.'" (quoting *Perrine v. Kennecott Mining Corp.*, 911 P.2d 1290, 1292 (Utah 1996))).

23. *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 73, 210 P.3d 263 ("When statutory language plausibly presents the court with two alternative readings, we prefer the reading that avoids absurd results." (internal quotation marks omitted)); *see also State v. Redd*, 1999 UT 108, ¶ 12, 992 P.2d 986 ("Where we are faced with two alternative readings, and we have no reliable sources that clearly fix the legislative purpose, we look to the consequences of those readings to determine the meaning to be given the statute.... In other words, we interpret a statute to avoid absurd consequences."); *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1045 n. 39 (Utah 1991) ("When dealing with unclear statutes, this court renders interpretations that will avoid absurd consequences." (internal quotation marks omitted)).

storage of oil and gas in pipelines and tanks, but not to build a road to access those same reserves, favors a contrary interpretation of this statute.

¶ 71 If subsection (a) said "solid mineral ores" instead of "mineral deposits," then the text would not be capable of two reasonable interpretations. If the statute said that, I would agree that the legislative judgment to forbid condemnation for roads to oil and gas reserves while allowing it for oil and gas pipelines would not be "so absurd" that the legislature could not have intended it.

¶ 72 But that is not the question in this case. Instead, as the majority acknowledges, the question is the proper meaning of the general, ambiguous term "mineral deposits"—a term that is "largely contextual" and could reasonably be understood to include or exclude oil and gas reserves. In such a case, the practical implications of either reading are not just relevant to the extent they tell us whether a certain outcome is "so absurd that the legislative body ... could not have intended it."

¶ 73 The question is not whether one construction or the other reaches the extreme level of absurdity, but whether one is a more reasonable explanation of the legislative scheme in light of the practical realities at stake. And we have said that where two meanings are plausible or linguistically permissible in a given context, and one interpretation leads to an absurd result, then we favor the other interpretation. *See supra* ¶ 70 n. 24. To me, it seems more consistent with the social, linguistic, and legal conventions implicated by this case to conclude that the legislature would have intended to authorize both roads and pipelines for oil and gas reserves.

### III

¶ 74 I see no need to resort to a canon of construction where the ambiguity in the statutory text can be resolved with traditional tools of construction. Because the legal and linguistic context of the eminent domain statute points persuasively to a mining or trade

definition of "mineral rights" that encompasses oil and gas, I would reverse.