**2017 UT App 20**

# THE UTAH COURT OF APPEALS

MIKE'S SMOKE, CIGAR & GIFTS,
Appellant,
*v.*
ST. GEORGE CITY,
Appellee.

Opinion
No. 20151030-CA
Filed February 2, 2017

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 130500429

Ryan L. Holdaway and Diane Pitcher, Attorneys
for Appellant

Bryan J. Pattison, Thomas J. Burns, Shawn M.
Guzman, and Paula J. Houston, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
concurred.

VOROS, Judge:

¶1      Mike's Smoke, Cigar & Gifts appeals the district court's
decision affirming the St. George City Council's revocation of its
business license for selling a controlled substance analog, a
synthetic cannabinoid commonly known as spice. On appeal,
Mike's contends that the district court incorrectly interpreted the
Controlled Substance Analog statute. We affirm.

BACKGROUND

¶2    Mike's is a retail business located in St. George, Utah, and licensed by the City to sell cigarettes and other tobacco-related products. Between March 2012 and January 2013, the Washington County Drug Task Force investigated Mike's for suspected distribution of a controlled substance commonly known as spice.[1] Employees of the store told Task Force agents that, because spice was illegal, they did not sell it, but they did sell "aroma therapy" products. In two undercover buys, Task Force agents purchased an aroma therapy product that was sold in packets labeled "Reborn."

¶3    Suspecting that Reborn was a controlled substance, the Task Force obtained and executed a search warrant against Mike's. While executing the warrant, a detective interviewed the store manager, who is the son of one of the store's owners. When questioned about the legality of Reborn, the store manager told the detective that the product had been tested and that Mike's had consulted with its attorney before selling Reborn. The store manager or one of the owners stated that Mike's purchased Reborn from a man they knew only by his first name. The store manager told the detective that he sells Reborn only to customers nineteen years of age or older and that they must ask for it by name. He also told the detective that he tells customers that they will go to jail if they smoke it. However, the store

---

1. "K2 or 'Spice' is a mixture of herbs and spices that is typically sprayed with a synthetic compound chemically similar to THC, the psychoactive ingredient[] in marijuana. . . . K2 is commonly purchased in head shops, tobacco shops, various retail outlets, and over the Internet. It is often marketed as incense or 'fake weed.'" Drug Enforcement Administration, *Drug Fact Sheet*, https://www.dea.gov/druginfo/drug_data_sheets/K2_Spice.pdf [https://perma.cc/QG59-T899].

manager admitted that he knew many of his customers did smoke Reborn. And his sister had seen customers smoking it in the parking lot. According to the store manager, sales of Reborn comprised over 30% of the store's daily sales.

¶4     The Task Force made at least three more undercover buys of Reborn. On each occasion, Mike's had stored the Reborn behind the counter, out of public view. The Reborn was sold in packets without a barcode. Instead of scanning a barcode on the Reborn itself, store employees scanned a barcode on the side of the cash register to enter its price. Following the second round of undercover buys, the Task Force obtained and executed a second search warrant, seizing multiple packets of Reborn from behind the counter and from a safe in the back room. The store owner was again interviewed; when asked if the names "Reborn" and "aroma therapy" were camouflage to skirt law enforcement, he responded, "Yeah."

¶5     The Utah Bureau of Forensic Services (the State Crime Lab) tested the seized Reborn and determined that it contained a chemical substance called XLR11. XLR11 is a chemical analog to a controlled substance, AM-694, sometimes called synthetic marijuana. *See* Utah Code Ann. § 58-37-4.2(6) (LexisNexis 2016); Drug Enforcement Administration, Drugs of Abuse 16 (2015), https://www.dea.gov/pr/multimedia-library/publications/drug_of_abuse.pdf, [https://perma.cc/37TB-G8A8]. After learning of the test results, the City revoked the shop's business license and ordered it to cease operating within the City. Mike's appealed the license-revocation order and requested a hearing before the St. George City Council.

¶6     At the City Council hearing, the City argued that Mike's violated Utah law by selling a controlled substance as defined by the Controlled Substance Analog Statute (the Analog Statute). Utah Code Ann. § 58-37-2(1)(g)(i) (LexisNexis 2016). The City presented three State Crime Lab reports (one from each test of

the seized Reborn) showing that the samples contained XLR11. The reports, signed by the State Crime Lab forensic scientist who tested each of the samples, explained that XLR11 has a substantially similar chemical structure to a listed controlled substance, AM-694. The reports concluded that XLR11 was thus a "structural analog" of AM-694, a controlled substance. Mike's responded that XLR11 was not a "structural analog" of AM-694. Mike's presented the City Council with two expert opinion letters. In the first opinion letter, a chemist opined that XLR11 is "substantially structurally different" from AM-694 and therefore is not a structural analog of AM-694. In the second opinion letter, a second chemist opined that XLR11 should not be considered an analog of AM-694. Neither chemist had tested the Reborn.

¶7　Based on the evidence at the hearing, the City Council found that Mike's sold a product containing XLR11; that XLR11 is an analog of a controlled substance, AM-694; and that Mike's "sold and possessed product with the intent to distribute" in violation of Utah Code section 58-37-8 (LexisNexis 2016). Thus, the City Council upheld the revocation of the store's business license and ordered it to cease conducting business within the City.

¶8　Mike's petitioned the district court for judicial review of the City Council's decision. In the petition, Mike's claimed that the City Council's decision was not supported by substantial evidence and that the definition of a controlled substance under the Analog Statute was unconstitutionally vague. *See id.* § 58-37-2(1)(g) (LexisNexis 2016) (defining "controlled substance analog"). The City responded that the City Council had correctly interpreted the Analog Statute, that the statute was constitutional, and that substantial evidence in the administrative record supported the City Council's revocation decision.

¶9　The district court remanded the matter back to the City Council to take testimony from both parties' experts. The

evidentiary hearing was necessary, the district court ruled, because "there [was] a disputed issue of fact as to whether the substance 'Reborn' ha[d] a substantially similar chemical structure to a controlled substance analog." The district court did not reach the merits of the Analog Statute's constitutionality. The City appealed the order, contending that the district court had applied the wrong standard of review. We agreed and remanded the case for further proceedings. *See Mike's Smoke, Cigar & Gifts v. St. George City (Mike's I)*, 2015 UT App 158, ¶¶ 15–16, 353 P.3d 626.[2]

¶10    On remand, the district court affirmed the City Council's decision to revoke the business license. It ruled that "based on 'the evidence in the record, both favorable and contrary,' the court determines that 'a reasonable mind could reach the same conclusion'" as the City Council. Hence, the district court upheld the City Council's license-revocation decision. Mike's appeals.


ISSUE AND STANDARD OF REVIEW

¶11    Mike's contends that the district court misinterpreted the Controlled Substance Analog Statute. Specifically, it argues that the Analog Statute "should be read in the conjunctive to avoid absurd results and valid constitutional challenges."[3]

---

2. The basic facts of the present opinion, up until our remand in *Mike's I*, borrow heavily from our court's prior opinion involving the same parties (but a different procedural issue) on appeal. *See Mike's Smoke, Cigar & Gifts v. St. George City*, 2015 UT App 158, ¶¶ 1–6, 353 P.3d 626.

3. At oral argument, counsel for Mike's also argued that the related, but distinct, absurdity doctrine required a conjunctive reading. *Cf. Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶¶ 69–70, 267 P.3d 863 (Lee, J., dissenting). We do not consider

(continued…)

¶12    "We review questions of statutory interpretation for correctness, giving no deference to the district court's interpretation." *Board of Educ. of Jordan School Dist. v. Sandy City Corp.*, 2004 UT 37, ¶ 8, 94 P.3d 234.

ANALYSIS

¶13    Mike's contends that the district court erred by applying a disjunctive rather than conjunctive interpretation of the Analog Statute. The Analog Statute, which defines a controlled substance, contains three subsections: (A), (B), and (C). Under the conjunctive reading preferred by Mike's, to qualify as a controlled substance analog, a substance must satisfy the definition listed in subsection (A) and the definition listed in either subsection (B) or subsection (C). Under the disjunctive reading preferred by the City and applied by the district court, to qualify as a controlled substance analog, a substance must satisfy the definition listed in any of the three subsections of the Analog Statute—subsection (A), or subsection (B), or subsection (C).

¶14    Mike's argues that a conjunctive reading of the Analog Statute is necessary under two canons of statutory interpretation: absurd consequences and constitutional avoidance. The City responds that, because a disjunctive reading is the only plausible reading of the statute, the statute is unambiguous, and thus no canon of construction applies.

¶15    The Utah Controlled Substances Act criminalizes the possession, sale, or use of any "controlled substance." *See*

(…continued)

the merits of unbriefed arguments asserted by appellants for the first time at oral argument. *See Washington v. Kraft*, 2010 UT App 266U, para. 12–13.

*generally* Utah Code Ann. § 58-37-8 (LexisNexis 2016) (defining the specific "prohibited acts" and "penalties" for defined "controlled substances"). The Act defines "controlled substance" to include "a controlled substance analog." *Id.* § 58-37-2(1)(f)(i)(C). The current version of the Act defines a "controlled substance analog" using a three-part definition:

> (g)(i) "Controlled substance analog" means:
>
> (A) a substance the chemical structure of which is substantially similar to the chemical structure of a controlled substance . . . ;
>
> (B) a substance which has a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of controlled substances . . . ; or
>
> (C) A substance which, with respect to a particular individual, is represented or intended to have a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of controlled substances . . . .

*Id.* § 58-37-2(1)(g)(i). The parties agree that this version of the Analog Statute controls this case. Furthermore, Mike's conceded below that "there is no question the legislature intended for the [current statute] to be read in the disjunctive"—meaning that a substance qualifies as a controlled substance analog if it satisfies any of the statute's three subsections—(A) it has a chemical structure similar to a controlled substance, (B) it produces an effect similar to a controlled substance, or (C) it is represented to have such an effect.

¶16　By contrast, under the predecessor statute, a substance did not qualify as a controlled substance analog unless it had a chemical structure similar to a controlled substance and had either (A) an effect similar to a controlled substance or (B) was represented to have such an effect:

> (g)(i) "Controlled substance analog" means a substance the chemical structure of which is substantially similar to the chemical structure of a controlled substance . . . :
>
> (A) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of controlled substances . . . ; or
>
> (B) which, with respect to a particular individual, is represented or intended to have a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of controlled substances . . . .

*Id.* § 58-37-2(1)(g)(i) (LexisNexis Supp. 2011).

¶17　Although Mike's effectively concedes that the legislature intended the current statute to be read in the disjunctive, it contends that a disjunctive reading runs afoul of two canons of statutory interpretation: the absurd consequences canon, and the constitutional avoidance canon.

¶18　First, Mike's argues that a literal reading of the Analog Statute yields absurd results. Specifically, Mike's argues that tobacco, energy drinks, and even monosodium glutamate could fall within the Analog Statute's definition of a controlled

substance under a disjunctive reading. Second, Mike's argues that the canon of constitutional avoidance is "useful" here because it counsels against adopting one of two plausible constructions of a statute on the ground that it would raise grave doubts as to the statute's constitutionality.

¶19 Our case law recognizes two different interpretive tools concerning absurdity: the absurd consequences canon and the absurdity doctrine. *Utley v. Mill Man Steel, Inc.*, 2015 UT 75, ¶ 46, 357 P.3d 992 (Durrant, C.J., concurring in part and dissenting in part). "We apply the absurd consequences canon to resolve ambiguities in a statute. If statutory language lends itself to two alternative readings, we choose the reading that avoids absurd consequences." *Id.* "The absurdity doctrine, by contrast, has nothing to do with resolving ambiguities. Rather, we apply [the absurdity doctrine] to reform unambiguous statutory language where applying the plain language leads to results so overwhelmingly absurd no rational legislator could have intended them." *Id.*

¶20 "The canon of constitutional avoidance is an important tool for identifying and implementing legislative intent. Its premise is a presumption that the legislature 'either prefers not to press the limits of the Constitution in its statutes, or it prefers a narrowed (and constitutional) version of its statutes to a statute completely stricken' by the courts." *Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 23, 332 P.3d 900 (quoting Richard L. Hasen, *Constitutional Avoidance and Anti-Avoidance by the Roberts Court*, 2009 Sup. Ct. Rev. 181, 186). "Thus, when a court rejects one of two plausible constructions of a statute on the ground that it would raise grave doubts as to its constitutionality, it shows proper respect for the legislature, which is assumed to 'legislate[ ] in the light of constitutional limitations.'" *Id.* (alteration in original) (quoting *Rust v. Sullivan*, 500 U.S. 173, 191 (1991)).

¶21   However, to employ either the absurd consequences canon or the constitutional avoidance canon, we must first identify an ambiguity in the statute. "It is well settled that when faced with a question of statutory interpretation, our primary goal is to evince the true intent and purpose of the Legislature." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (citation and internal quotation marks omitted). And the "best evidence of the legislature's intent is the plain language of the statute itself." *Id.* (citation and internal quotation marks omitted). When the meaning of a statute "can be discerned from its language, no other interpretive tools are needed." *Id.* ¶ 15 (citation and internal quotations marks omitted); *see also Utah Republican Party v. Cox*, 2016 UT 17, ¶ 7, 373 P.3d 1286 (stating that "there is no ambiguity in [the statute] that would trigger resort to the canon of constitutional avoidance"). Only when the statutory language is ambiguous—where, after we have conducted a plain language analysis, its terms remain susceptible to two or more reasonable interpretations—do we resort to other modes of statutory construction. *Marion Energy*, 2011 UT 50, ¶ 15.

¶22   Mike's maintains that "the plain language and contextual driven analysis results in the statute being ambiguous." Mike's contends that "a contextual analysis" of the Analog Statute "lends itself to competing interpretations as to whether the 'or' should apply throughout." However, Mike's has effectively conceded that the legislature intended the statute to be read in the disjunctive:

> Let it be said at the outset that [Mike's] has never argued the legislature ever intended anything other than precisely what the City claims it meant. There is no question the legislature intended for the amended [Utah Code section] 58-37-2(1)(g) to be read in the disjunctive. . . . [Mike's] is not suggesting the proper reading of the statute is in

> the conjunctive because the legislature intended it,
> but rather that it must be read in the conjunctive
> because the Constitution requires it.

As we read it, this statement constitutes a concession from Mike's that the statute is not ambiguous: it makes the intent of the legislature clear. An appellant is "not at liberty to argue one position below and then take the opposite position on appeal." *Bailey-Allen Co. v. Kurzet*, 945 P.2d 180, 185 (Utah Ct. App. 1997).

¶23 In any event, like the district court, the City Council, the City, and Mike's below, we see no ambiguity in the statute. The text of the Analog Statute begins with an introductory clause stating "(g)(i) 'Controlled substance analog' means" followed by a colon. Utah Code Ann. § 58-37-2(1)(g)(i) (LexisNexis 2016). After the colon, the Analog Statute includes three subsections: (A), (B), and (C). *Id.* In parallel language, each of the subsections begins with the words "a substance," describes the substance as something which has the characteristics defined by each subsection, and ends with a semicolon. *Id.* An "or" separates subsections (B) and (C) but does not separate subsections (A) and (B). *See id.* When words are used in a series connected with a single "or" between the last two items, the "'or' . . . applies to the whole series." *See Ringwood v. State*, 333 P.2d 943, 944 (Utah 1959). Thus, the "or" in the Analog Statute between subsection (B) and (C) must also apply between subsections (A) and (B). *See id.* In addition, the parallel structure of the Analog Statute, the consistent use of the term "a substance" as the subject of each subsection, and the separation of each subsection with a semicolon demonstrate that the legislature intended each subsection to apply independently.

¶24 Moreover, a comparison of the current Analog Statute to the 2011 version (cited above) further demonstrates our legislature's intent to change the Analog Statute from a conjunctive definition—requiring A and either B or C—to a

disjunctive definition—requiring A or B or C. Specifically, the current Analog Statute's removal of the colon after its description of the chemical structure of a substance, moving the chemical structure material from the heading of the statute into its own subsection, and drafting each of the three subsections in parallel language shows that the legislature intended the definition to be read in the disjunctive—satisfied if any of the three subsections were met. *Compare* Utah Code Ann. § 58-37-2 (LexisNexis Supp. 2011), *with id.* (2016).[4]

¶25    Because the text of the Analog Statute is unambiguous—that is, susceptible to only one plausible reading—we do not resort to other modes of statutory construction, such as the absurd consequences canon or the constitutional avoidance canon. *See Marion Energy*, 2011 UT 50, ¶ 15.[5]

---

4. Mike's places considerable reliance on federal cases construing the federal counterpart to our Analog Statute. However, each of those cases relies, or follows precedent that relies, on a threshold determination that the federal statute is ambiguous. Because the federal statute varies somewhat from our statute, and because, unlike the federal statute, our statute is not ambiguous, those cases lack persuasive force. *See United States v. Turcotte*, 405 F.3d 515, 522 (7th Cir. 2005), *abrogated on other grounds by McFadden v. United States*, 135 S. Ct. 2298 (2015); *United States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003); *United States v. Klecker*, 228 F. Supp. 2d 720, 727 (E.D. Va. 2002) (collecting cases).

5. Mike's does not ask us in its briefing on appeal, *see supra* ¶ 11 note 3, to take the "drastic step" of invoking the absurdity doctrine on the ground that the "plain language leads to results so overwhelmingly absurd no rational legislator could have intended them." *Utley v. Mill Man Steel, Inc.*, 2015 UT 75, ¶¶ 46, 48, 357 P.3d 992 (Durrant, C.J., concurring in part and dissenting in part). But even considering that doctrine, we would follow the

(continued…)

CONCLUSION

¶26 Because the district court correctly read the Analog Statute according to its plain meaning, the judgment of the district court is affirmed.

───────────

(…continued)

approach our supreme court took in *In re Z.C.*, 2007 UT 54, 165 P.3d 1206. There, the court analyzed the absurd results question "in the context of the law actually applied and the act with which the State chose to charge Z.C., not the law that might have been applied or the act with which the State could have charged Z.C." *Id.* ¶ 17 n.6. And it concluded that "applying the plain language of the statute *in this case* produces an absurd result." *Id.* ¶ 17 (emphasis added). And even Mike's does not argue that applying the plain meaning of the Analog Statute to the facts of this case yields an absurd result. Nor do we believe it does.

And as in the district court, Mike's "is not challenging the constitutionality of the statute." Instead, Mike's urges us to apply the canon of constitutional avoidance. But here "there is no ambiguity in [the statute] that would trigger resort to the canon of constitutional avoidance." *See Utah Republican Party v. Cox*, 2016 UT 17, ¶ 7, 373 P.3d 1286.