*In This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 8**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH, in the interest of E.M.,
a person under eighteen years of age.

E.M.,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20220968
Heard September 9, 2024
Filed April 3, 2025

On Certification from the Court of Appeals

Third District Juvenile Court, Salt Lake County
The Honorable Susan H. Eisenman
No. 1199717

Attorneys:

Monica Maio, Hilary S. Forbush, William R. Russell,
Hannah Welch, Salt Lake City, for appellant

Derek E. Brown, Att'y Gen., Andrew F. Peterson, Deputy Solic.
Gen., Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN,
JUSTICE HAGEN, and JUSTICE POHLMAN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1 E.M. was fifteen years old when he allegedly killed twenty-year-old S.A. and wounded four other people in a racially

motivated shooting. He was arrested shortly after the shooting, and the State filed charges against him for multiple crimes, including murder, in juvenile court. The issue before us is whether the juvenile court abused its discretion in transferring E.M.'s case to district court.

¶2 Our analysis is centered in Utah Code sections 80-6-503 and -504 (the Transfer Statute).[1] In 2020, the legislature amended Utah Code section 80-6-503, significantly limiting the number of fifteen-year-olds charged with crimes in juvenile court who are eligible for transfer consideration. And in those few qualifying cases where a fifteen-year-old is eligible for transfer consideration, the juvenile court has broad discretion to retain jurisdiction. Because of the complicated nature of these determinations, the legislature directed juvenile courts to individually and holistically approach each juvenile and their specific set of circumstances to decide whether transfer is ultimately in the best interests of the juvenile and the public. To effectuate the Transfer Statute's purposes, that analysis is not and cannot be a formulaic calculation.

¶3 We hold that the juvenile court did not abuse its discretion when it concluded that E.M.'s case is one where transferring a fifteen-year-old to district court is appropriate.

## BACKGROUND[2]

¶4 In June of 2021, F.N. held a high school graduation party at Trolley Square. The party ended around 12:30 a.m. the following morning when a fight broke out and shots were fired. F.N. and five others, including S.A., left Trolley Square and went to S.A.'s house to continue to hang out. Around 1:40 a.m., a drive-by shooting

---

[1]The Juvenile Court Act (Utah Code §§ 80-6-501 to -508) was recodified during the 2021 legislative session, and the numbering changes went into effect on September 1, 2021. Juvenile Recodification, H.B. 285 §§ 161 to 167, 2021 Leg., Gen. Sess. (Utah 2021) (available at https://le.utah.gov/~2021/bills/static/HB02 5.html). Other sections have since been amended, but the relevant provisions remain substantively the same. We use the current statutory citations for ease of reference.

[2] These alleged facts are taken from record documents related to E.M.'s preliminary hearing in the juvenile court. We emphasize that E.M. has not yet been tried and that these remain unproven allegations at this stage.

occurred outside of S.A.'s house, killing S.A. and wounding four others. E.M., who was fifteen years old at the time, was arrested in connection with the incident.

¶5   The State filed an information in juvenile court, charging E.M. with sixteen felony counts, including one count of murder, six counts of felony discharge of a firearm causing serious bodily injury, one count of obstruction of justice, and eight additional counts of felony discharge of a firearm. The State then asked the juvenile court to transfer E.M.'s case to the district court.

¶6   The juvenile court held a preliminary hearing as contemplated by the Transfer Statute.[3] Eight witnesses testified at that hearing. After the hearing, the juvenile court issued findings of fact and conclusions of law, ultimately transferring E.M.'s case to the district court. The juvenile court found that the State had established probable cause that E.M. was a principal actor in the transfer-qualifying offense of murder.[4] After finding E.M.'s charge eligible for transfer, the juvenile court went on to analyze under the Transfer Statute's five retention factors whether it was "contrary to the best interests of the minor and the public for the juvenile court to retain jurisdiction over the offense."[5]

¶7   The juvenile court made detailed findings about E.M.'s life, the circumstances that led up to and followed the shooting, and the alleged racial motivation that fueled the offenses. It first discussed the seriousness of the qualifying crime and whether it was allegedly committed in an aggressive, violent, premeditated, or willful manner. It highlighted that "[t]he crimes alleged here were exceedingly dangerous and could have resulted in the deaths of several people. . . . But for what seems to be miraculous luck, five people could have died." The juvenile court also noted the allegation that "[t]he shootings and the murder were racially motivated by a desire to kill persons of Polynesian descent," which the juvenile court considered to be more serious than a murder that was not racially motivated because "it shows extreme depravity and callousness toward human life."

---

[3] *See id.* § 80-6-504(1).

[4] *See id.* § 80-6-504(2)(a). E.M. does not challenge the juvenile court's probable cause determination on appeal.

[5] *See id.* § 80-6-504(2)(b), (3).

¶8 Regarding whether the crime was committed in an aggressive, violent, premeditated, or willful manner, the juvenile court highlighted the weapon allegedly used in the commission of the crime: "The rifle used was a rifle built for long range firing, and has a higher capacity for over-penetration (i.e. the ability to go through walls) than a gun like a pistol." Based on testimony from three people in the car, the group likely also had a pistol with them. "But they chose to use the rifle, which is capable of shooting more bullets and causing more damage." The juvenile court found that choice to be "extremely violent and aggressive." It also highlighted the premeditated nature of the alleged crimes, describing them as "retaliation for the shooting that had occurred earlier at Trolley Square," a "retaliation that was truly aimed at hurting people who had been at the graduation party, or even just random Polynesian people."

¶9 Next, the juvenile court dove deeply into E.M.'s social history, discussing his "very difficult childhood, marked with extreme loss and trauma." E.M. was born in South Sudan. When he was a young child, war broke out in the city where he and his family lived. E.M.'s father was a soldier, and his family's home was often the target of gun violence. E.M. witnessed his grandmother being beaten to death and his sister being gang raped. After being shot in the leg and left for dead, E.M. fled with his sister to a refugee camp in Kenya. Life in the refugee camp was focused on survival; E.M. and his sister lived in constant fear of people coming to take them and hurt them.

¶10 After E.M. and his sister resettled in the United States, life continued to be a struggle. E.M. was bullied in school for his immigrant status and skin color. He struggled with trauma from his experiences in South Sudan and Kenya and would wake up screaming at night. E.M. had little education before arriving in Utah, and he had not received any sort of therapy or treatment to address his trauma.

¶11 Last, the juvenile court noted that E.M. had no prior criminal record and evaluated the likelihood of E.M.'s rehabilitation "by use of services available in the juvenile court." Citing E.M.'s forensic mental health evaluation, the juvenile court noted that E.M. is "experiencing post-traumatic stress disorder and significant emotional distress related to his previous life experiences and present situation." It also highlighted that E.M. had "not received any mental health services prior to" entering

custody. The juvenile court noted E.M.'s progress in detention, and that "he has shown increased maturity, and social growth." But it determined incidents of assault E.M. committed while in detention showed "E.M. continues to be triggered to racially motivated violence."

¶12 Based on the juvenile court's findings on each retention factor, it ultimately held "that the State has met its burden to show that retention of [E.M.] in the [j]uvenile [c]ourt is contrary to both the best interest of the public and to [E.M.]'s best interest." E.M. sought interlocutory review of the juvenile court's transfer order.

## STANDARD OF REVIEW

¶13 The sole issue before us is whether the juvenile court erred in transferring E.M.'s case to the district court. When a court has "discretion to weigh factors, balance competing interests, or otherwise choose among a range of permissible approaches or outcomes, those discretionary determinations must rest upon sound legal principles."[6] Whether the juvenile court properly interpreted the Transfer Statute is a "question of law that we review for correctness."[7] We review the juvenile court's application of the Transfer Statute for abuse of discretion.[8]

## ANALYSIS

¶14 Under Utah law, cases involving juveniles accused of serious crimes are ordinarily adjudicated in juvenile court.[9] After receiving a referral from law enforcement, a prosecuting attorney

---

[6] *Id.* ¶ 21.

[7] *State v. MacGuire*, 2004 UT 4, ¶ 8, 84 P.3d 1171 (cleaned up).

[8] *See State v. Boyden*, 2019 UT 11, ¶ 16, 441 P.3d 737. We note that in *In re I.R.C.*, 2010 UT 41, 232 P.3d 1040, we analyzed a challenge to application of a prior version of the Transfer Statute under the mixed question of law and fact standard. *See id.* ¶ 12. The legislature has since amended the Transfer Statute, which now emphasizes it is up to the juvenile court's discretion to determine how to weigh the statute's factors. *See infra* Part I. This change makes abuse of discretion the appropriate standard of review for the question of whether the juvenile court properly applied the current version of the Transfer Statute.

[9] *See* UTAH CODE §§ 80-6-301, -601.

files a petition in juvenile court.[10] In a limited set of cases, a prosecuting attorney may then seek to transfer a juvenile to district court by filing a criminal information in the juvenile court.[11] Minors may be considered for transfer only if they are charged with a qualifying offense. [12] For fifteen-year-olds like E.M., that includes murder, aggravated murder, attempted murder, or attempted aggravated murder.[13] To secure transfer, the prosecuting attorney must first establish "probable cause to believe that a qualifying offense was committed and the minor committed that offense."[14] Then the juvenile court must find "by a preponderance of the evidence, that it is contrary to the best interests of the minor and the public for the juvenile court to retain jurisdiction over the offense."[15]

¶15 In making this best interests determination, the juvenile court must "consider and make findings on" several retention factors:

> (a) the seriousness of the qualifying offense and whether the protection of the community requires that the minor is detained beyond the amount of time allowed under Subsection 80-6-802(1), or beyond the age of continuing jurisdiction that the juvenile court may exercise under Section 80-6-605; (b) the extent to which the minor's actions in the qualifying offense were committed in an aggressive, violent, premeditated, or willful manner; (c) the minor's mental, physical, educational, trauma, and social history; (d) the criminal record or history of the minor; and (e) the likelihood of the minor's rehabilitation by the use of services and facilities that are available to the juvenile court.[16]

---

[10] *Id.* §§ 80-6-301, -304.5, -305.

[11] *Id.* § 80-6-503.

[12] *Id.*

[13] *Id.* §§ 80-6-503(1)(b)(ii), -504.

[14] *Id.* § 80-6-504(2)(a).

[15] *Id.* § 80-6-504(2)(b).

[16] *Id.* § 80-6-504(3).

The legislature left the determination of how much weight to give each of these factors up to "the juvenile court's discretion."[17]

¶16 E.M. argues the juvenile court misapplied the Transfer Statute's retention factors because it considered facts that went beyond the elements of the transfer-qualifying crime, and because it determined elements of E.M.'s social history ultimately weighed in favor of transfer. We first look to the Transfer Statute's text to assess how the legislature intended the juvenile court to apply the best interests framework. We then address each of E.M.'s misapplication arguments in turn.

I. THE TRANSFER STATUTE INSTRUCTS JUVENILE COURTS TO HOLISTICALLY APPROACH JUVENILE TRANSFER DETERMINATIONS

¶17 "We have repeatedly affirmed our commitment to interpreting statutes according to the plain meaning of their text."[18] And "[w]hen the meaning of a statute can be discerned from its language, no other interpretive tools are needed."[19] Any "speculation as to a contrary legislative purpose cannot quash our construction of the plain language."[20] The Transfer Statute's text provides clear and complete instruction on how the legislature intended the juvenile court to apply the statute, and so we need not wade any further in search of additional meaning.

¶18 The Transfer Statute lays out five retention factors for the juvenile court to "consider and make findings on" in the course of "making a determination" about whether retention of the case in juvenile court is "contrary to the best interests of the minor and the public."[21] Each factor is broad, with some listing multiple sub-factors.[22] The Transfer Statute also states that "[t]he amount of

---

[17] *Id.* § 80-6-504(4).

[18] *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (cleaned up).

[19] *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 15, 267 P.3d 863 (cleaned up).

[20] *See Olsen*, 2011 UT 10, ¶ 23.

[21] UTAH CODE § 80-6-504(2)(b), (3).

[22] *See, e.g., id.* § 80-6-504(3)(a) (stating the juvenile court shall consider "the seriousness of the qualifying offense *and* whether the protection of the community requires that the minor is detained

weight that each factor in Subsection (3) is given is in the juvenile court's discretion."[23]

¶19 Here, the direction to "consider" the factors on the way to some ultimate determination suggests the court's analysis is meant to be a holistic evaluation, not a mechanical calculation.[24] Though the statute directs the court to make "findings" on each factor, the nested nature of the sub-factors suggests that a juvenile court need not make findings on every listed item, but should consider evidence related to each general category before deciding whether retention is contrary to a juvenile's and the public's best interests.[25] The statute gives the juvenile court wide discretion when weighing each factor, prescribing no set formula of how facts should be weighed, nor how much weight they should be given.[26] Taking the section as a whole, we conclude that the legislature intended juvenile courts to undertake a holistic analysis, not to treat each factor as a bucket with a final score to be added or subtracted against the other categories of evidence.

¶20 This holistic approach to the retention factor analysis is consistent with the legislature's 2020 amendments to the Transfer Statute, narrowing its application to a more limited set of juveniles.[27] Previously, fifteen-year-olds like E.M. were eligible for transfer to the district court if the juvenile committed any felony.[28] Now, those juveniles are eligible for transfer consideration only if

---

beyond the" ordinary time for juvenile jurisdiction (emphasis added)); *id.* § 80-6-504(3)(c) (stating the juvenile court shall consider "the minor's mental, physical, educational, trauma, *and* social history" (emphasis added)).

[23] *Id.* § 80-6-504(4).

[24] *See id.* § 80-6-504(3).

[25] *Id.* § 80-6-504(2), (3).

[26] *Id.* § 80-6-504(4).

[27] Juvenile Justice Amendments, H.B. 384, 2020 Leg., Gen. Sess. (Utah 2020) (available at https://le.utah.gov/~2020/bills/static/HB0384.html).

[28] UTAH CODE § 78A-6-703(1) (2019).

the juvenile commits one of four specific felonies: murder, aggravated murder, or attempt of either.[29]

¶21 E.M. argues that the legislature's decision to decrease the number of offenses that qualify a juvenile for transfer consideration implies a broader principle "that juvenile courts must apply the transfer statute and its retention factors narrowly and with the presumption that fourteen- and fifteen-year-old youth should remain in the juvenile system except in the most extreme situations." But this argument implies a command that is not in the text of the statute. And "[w]here statutory language is plain and unambiguous, this Court will not look beyond the same to divine legislative intent."[30]

¶22 The Transfer Statute instructs that no fourteen- or fifteen-year-old may be tried in the district court unless the juvenile is alleged to have committed murder, aggravated murder, or attempt of either.[31] This tells us the legislature intended to narrow the types of offenses that qualify a juvenile for transfer, a change that would inherently reduce the number of younger juveniles transferred to district court. This amendment does not then also imply that the legislature intended to put a thumb on the scale in the retention factor analysis to always weigh toward retention.

¶23 The legislature was clear that it intended for juvenile courts to exercise their discretion in conducting an individual evaluation of each juvenile case being considered for transfer to district court.[32] In some instances, the retention factors will ultimately weigh in favor of retention, and in others, they will weigh against. That the juvenile court concluded that the holistic approach weighs against retention for this particular defendant does not mean that it will weigh against retention for every

---

[29] *Id.* § 80-6-503(1)(b).

[30] *Brinkerhoff v. Forsyth*, 779 P.2d 685, 686 (Utah 1989); *see also Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 17, 285 P.3d 766 ("Where the statute's language marks its reach in clear and unambiguous terms, it is our role to enforce a legislative purpose that matches those terms, not to supplant it with a narrower or broader one that we might infer from the legislative history." (cleaned up)).

[31] UTAH CODE § 80-6-503(1)(b); *id.* § 80-6-504(1), (2).

[32] *Id.* § 80-6-504(4).

defendant. This lack of predictability may be unsatisfying, but the statutory text demands freedom for a juvenile court to consider all the circumstances relevant to any given juvenile's transfer determination. Interpreting the Transfer Statute with any less flexibility would undermine the legislature's decision to vest juvenile courts with that decision-making power.

¶24 Having addressed how the retention factors must be applied, we now turn to E.M.'s arguments regarding whether the juvenile court erred in evaluating any individual factor.

### A. The Juvenile Court Did Not Err When Evaluating the Seriousness of E.M.'s Offense

¶25 First, E.M. argues the juvenile court erred by considering, as part of the seriousness factor analysis, the non-qualifying offenses E.M. allegedly committed during the same criminal episode as the qualifying offense. The first retention factor requires the juvenile court to consider "the seriousness of the qualifying offense and whether the protection of the community requires that the minor is detained beyond the amount of time allowed under Subsection 80-6-802(1), or beyond the age of continuing jurisdiction that the juvenile court may exercise under Section 80-6-605."[33] E.M. argues that this factor only allows the juvenile court to consider the seriousness of the *qualifying offense* in isolation, and that facts and circumstances falling outside the qualifying offense cannot be considered to inform "the level of seriousness as contemplated" in the seriousness retention factor.

¶26 Here, in the context of an alleged drive-by shooting, E.M.'s approach would mean the juvenile court could consider only the seriousness of actions that gave rise to the qualifying offense of murder and could not consider any facts related to non-qualifying offenses that occurred during the same criminal episode. This would mean the juvenile court could consider only the firing of the two bullets that killed S.A., and it would be forced to ignore "the four other people [who were] shot multiple times and [who were] grievously wounded," and the alleged racial motivation behind the shooting.

¶27 A juvenile court cannot fully comply with the requirements of the retention factors if it must look through a pinhole to try to comprehend an entire picture. Understanding

---

[33] *Id.* § 80-6-504(3)(a).

seriousness requires context. Consistent with the holistic approach to the retention factors, juvenile courts must be able to consider all the interrelated circumstances that accompany a qualifying crime, not just the discrete facts required to convict the minor of that qualifying crime.[34] If we were to take E.M.'s sterilized approach, the natural conclusion would be that all murders are serious.[35]

¶28 What makes one murder more—or less—serious than another is circumstantial and requires examining the surrounding facts. For example: What motivated the act? Who else did the assailant put at risk in the commission of the act? Was the act targeted or random? Limiting the universe of what a juvenile court can consider to only the very few facts that meet the elements of the charged offense—the facts that speak only to whether E.M. "intentionally or knowingly cause[d] the death of another individual"[36]—paints an incomplete picture of the qualifying offense, a picture insufficient to flesh out the personalized analysis the retention factors require.

¶29 We thus conclude the juvenile court did not err in its seriousness analysis when it considered facts, circumstances, and non-qualifying offenses that provided context to assess the seriousness of the qualifying offense.

---

[34] The parties engage in some discussion about whether the retention factors are exhaustive categories. *See id.* § 80-6-504(3). But neither party argued any facts that fell outside the list of factors, and it is difficult to imagine a fact that would. This forecloses the need for us to address whether the factors are exhaustive. We instead wait for the case where someone argues that the court considered, or should have considered, evidence outside of those retention factors to address whether they are exhaustive categories.

[35] *See State v. Bishop*, 717 P.2d 261, 269 (Utah 1986) ("It is generally accepted that murder is more serious than other crimes.").

[36] UTAH CODE § 76-5-203(2)(a). While this subsection of the code provides several other definitions of murder, the "intentional and knowing" definition applies because the juvenile court indicated in its Preliminary Hearing Findings of Fact and Conclusions of Law that "there is probable cause to establish that [E.M.] intentionally or knowingly caused the death of S.A."

B. *The Juvenile Court Did Not Err When Evaluating Whether E.M.'s Actions Were Committed in an Aggressive, Violent, Premeditated, or Willful Manner*

¶30  Next, we turn to E.M.'s related argument that the juvenile court erred in considering the context of the qualifying crime when it evaluated whether E.M. committed the crime in an "aggressive, violent, premeditated, or willful manner."[37] E.M. argues the juvenile court should not have considered non-qualifying offenses as part of its analysis on this factor. But whether an act is aggressive, violent, premeditated, or willful, again, requires context. Zeroing in on whether a bullet killed a victim and whether the shooter intended that bullet to kill that victim does not provide facts that this factor is aimed at: not just if, but how, the crime was committed.

¶31  Nothing in the statute dictates that this analysis must be cabined to facts that directly prove an element of the qualifying crime. And the text of this factor in particular, "the extent to which the minor's actions in the qualifying offense were committed in an aggressive, violent, premeditated, or willful manner," requires a juvenile court to consider facts that necessarily go beyond the elements.[38] The *manner* in which the qualifying offense was committed—*how* it was committed—is a different inquiry from *whether* the qualifying offense was committed.

¶32  We conclude that looking to the surrounding circumstances of the qualifying crime to determine whether it was committed in an "aggressive, violent, premeditated, or willful manner" is not only appropriate but imperative to meet the mandates of the Transfer Statute.

C. *The Transfer Statute Does Not Dictate That Trauma History Can Weigh Only in Favor of Retention*

¶33  Regarding the juvenile court's analysis of E.M.'s "mental, physical, educational, trauma, and social history,"[39] E.M. argues the juvenile court erred in considering his trauma to be an aggravating factor instead of a mitigating one. In its evaluation of this factor, the court cited E.M.'s forensic mental health evaluation

---

[37] *See id.* § 80-6-504(3)(b).

[38] *Id.*

[39] *Id.* § 80-6-504(3)(c).

noting that "[t]rends in research indicate adolescents exposed to and involved in traumatic incidents have a higher rate of involvement in delinquent behavior." The report continued that "[E.M.]'s exposure to and history of trauma is important to consider as it likely contributed to his current situations as children exposed to trauma are typically less resilient . . . and are more prone to . . . *lifelong* health, mental health, and substance abuse problems."[40]

¶34 Citing this forensic evaluation, the juvenile court found it "extremely concerning" that E.M. was accused of committing the same sort of violence and depravity he witnessed as a child in South Sudan. And it found that E.M.'s history "may explain why he would be involved in delinquent behavior or why he would lack regard for human life." Ultimately the juvenile court concluded that, in light of E.M.'s "extremely traumatic childhood," rehabilitation might take longer than the nine years of rehabilitation services he would receive if he were not transferred to district court, and that this trauma history factor weighed in favor of transfer.

¶35 E.M. cites *Roper v. Simmons* for the proposition that minors are "categorically less culpable than the average criminal," and so "it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed."[41] While this is an accurate recitation of *Roper*, it is inapplicable to the retention factor analysis. *Roper* focused on culpability and advised courts not to punish minors as severely as adults when their criminal missteps are the result of "transient immaturity."[42] Here, the juvenile court did not use E.M.'s traumatic history to determine culpability, nor did it imply that E.M.'s youth was to blame for his criminal decisions. Instead, the juvenile court asked whether E.M.'s unique, personal traumatic history that created the lens through which he sees the world is something he can easily overcome. E.M. suffered a bitterly unfair and difficult childhood "marked with extreme loss and trauma" that has left deep and lasting wounds. Ultimately, the juvenile

---

[40] (Emphasis added.)

[41] 543 U.S. 551, 567, 570 (2005) (cleaned up).

[42] *Id.* at 573; *see also Graham v. Florida*, 560 U.S. 48, 68 (2010).

court determined that if these wounds are not adequately treated, they may negatively influence E.M.'s behavior for a lifetime.

¶36 E.M. argues it was inappropriate for the juvenile court to use his trauma history "against him" to support a finding that transfer is in his best interests. But on review of the statutory text, we find no reason that a juvenile's trauma must weigh against his transfer.

¶37 We acknowledge the difficult position this puts defense counsel in: by introducing social history, any defendant likely hopes to provide explanation for his qualifying crime and potentially mitigate the possibility of transfer. But there is no formula that tells us when any particular traumatic experience will weigh for or against a juvenile being retained or transferred. Ultimately, the Transfer Statute seeks to guide the juvenile court to the outcome that is in the best interests of both the minor and of the public, with the hope of helping each minor rehabilitate and recover from the individual circumstances that informed his alleged choice to commit a very serious crime. Here, the fullest picture of E.M.'s life provided the best opportunity for the juvenile court to reach the best possible outcome for E.M. and the public. And the juvenile court had the discretion to take in all the available information about E.M.'s life, to listen to experts, and ultimately to weigh everything in front of it to determine whether transfer was appropriate.

## II. THE JUVENILE COURT DID NOT ABUSE ITS DISCRETION WHEN APPLYING THE TRANSFER STATUTE

¶38 Having addressed E.M.'s arguments about how individual factors are to be interpreted, we now turn to the broader question of whether the juvenile court correctly applied the Transfer Statute when determining that it was in E.M.'s and the public's best interests to transfer his case to district court.

¶39 Here, the juvenile court considered and made findings on all the Transfer Statute's retention factors. It recited specific facts and made additional factual findings in support of its decision to transfer. And, as discussed above, it did not err in its approach to any one factor.

¶40 First, the juvenile court made specific findings "related to [the] seriousness of the offense and the extent to which [E.M.]'s actions were committed in an aggressive, violent, premeditated or

willful manner," factors (a) and (b).[43] It also made specific findings regarding "facts related to [E.M.'s] social history," factor (c).[44] The juvenile court then acknowledged that "[t]he parties stipulated that [E.M.] had no delinquency history prior to the filing of this criminal information," satisfying consideration of factor (d), whether the minor had any criminal record or history.[45] Last, the juvenile court made findings "related to the likelihood of rehabilitation by use of services available in the juvenile court," the final factor (e).[46]

¶41 After making findings on each factor, the juvenile court discussed in detail how those findings supported transferring E.M. to district court. It summarized,

> There are a lot of unknowns. This is only a preliminary decision that sets the course of the case going forward. But, given the seriousness of the offense, the evidence at this stage of the proceeding, and the retention factors weighted in favor of community safety, the Court finds that the State has met its burden to show retention of [E.M.] in the [j]uvenile [c]ourt is contrary to both the best interest of the public and to [E.M.]'s best interest.

The juvenile court made all appropriate findings and thoughtfully and thoroughly weighed the evidence in front of it. We hold that the juvenile court acted within its discretion in transferring E.M.'s case to district court.

## CONCLUSION

¶42 The weight of transfer is not lost on this court. Nor was it lost on the juvenile court. As E.M. notes, "[t]he Utah Legislature has continually narrowed which youth and what offenses may be transferred to the criminal legal system," and "only those youth who commit the most heinous offenses" are ever to be considered for transfer. It is alleged that E.M. committed one of those "most heinous offenses," and the legislature entrusted the decision of whether transfer was appropriate to the juvenile court's discretion. Discerning no abuse of discretion in the juvenile court's analysis,

---

[43] UTAH CODE § 80-6-504(3)(a), (b).

[44] *Id.* § 80-6-504(3)(c).

[45] *Id.* § 80-6-504(3)(d).

[46] *Id.* § 80-6-504(3)(e).

we uphold the juvenile court's decision that transfer is in the best interests of E.M. and the public.

———————